GEORGE LASICH,

*Plaintiff and Appellant*

vs.

CLARENCE W. WIMPENNEY,

*Defendant Respondent.*

GEORGE LASICH,

*Plaintiff and Respondent*

vs.

CLARENCE W. WIMPENNEY,

*Defendant and Appellant.*

(Nos. 2634 and 2638; January 18th, 1955; 278 Pac. (2d.) 807)

For the plaintiff and appellant in Case No. 2634 and respondent in Case No. 2638, the causes were submitted upon the brief of Moran and Murphy of Riverton, Wyoming, and oral argument by Mr. R. Lauren Moran.

For the defendant and respondent in Case No. 2634 and defendant and appellant in Case No. 2638, the causes were submitted upon the brief and also oral argument of W. M. Haight of Riverton, Wyoming.

OPINION

RINER, Chief Justice

CASE NO. 2634

The plaintiff and appellant, George Lasich, is hereinafter usually designated "appellant" or by his surname, Lasich. The respondent, Clarence Wimpenney, will also be usually referred to herein as aligned in this court or by his surname, Wimpenney.

Lasich as principal contractor undertook to erect a dwelling house on a certain lot in Riverton, Wyoming. This lot was owned by Wimpenney, and the dwelling house aforesaid was built by Lasich for the owner. It developed that Lasich was not so situated financially as to enable him to construct this building in accord with a certain written contract which the parties executed after a number of conferences about the matter. This contract thus signed by Lasich and Wimpenney was couched in this language:

"BUILDING CONTRACT

"THIS AGREEMENT made and entered into this first day of August, 1951, by and between C. Wimpenney, hereinafter referred to as the owner, and George Lasich, hereinafter referred to as the contractor, both of Riverton, Wyoming.

"WITNESSETH:

"FOR AN (sic) IN CONSIDERATION HEREINAFTER STATED TO BE PAID BY THE OWNER,

the contractor hereby covenants and agrees to and with the owner to construct a dwelling house upon Lot 7 in Block 24 of Ashgrove Addition to the Town of Riverton, Fremont County, Wyoming, in accordance with the following terms and conditions:

"1. PLANS AND SPECIFICATIONS. Said building will be of frame construction and in accordance with the plans and specifications heretofore agreed upon and approved by the parties.

"2. MATERIALS AND LABOR. All materials and labor necessary to construct said building will be furnished by the contractor, and said materials will be of good quality, as specified, and all work and labor will be performed in a good and workmanlike manner to the reasonable satisfaction of the owner.

"3. TIME. Construction will start immediately after the execution of these presents and will continue without interruption or delay to completion. The contractor will keep an adequate number of workmen employed on the building at all times to insure its completion by December 1, 1951. The contractor, however, will not be liable for work stopages (sic) occasioned by labor or material shortages which he is unable to avoid with the exercise of reasonable diligence. If, however the contractor does not complete the building, under the terms above stated, by December 1, 1951, a penalty of twenty five dollars per day may be assessed by the owner, for each day after December 1, 1951, until the building is fully completed and this penalty of twenty five dollars per day may be deducted by the owner from the final payment, as provided below in this contract.

"4. LIEN CLEARANCE. Upon completion of said building the contractor will furnish satisfactory evidence that all materials and labor have been paid in full before final payment under this contract shall be due.

"CHANGES. The owner shall have the privilege of making minor changes in the construction plans and the contract price shall be adjusted accordingly but no changes so made shall increase the contract price unless the amount thereof is mutally (sic) agreed upon

in advance and evidenced by written menorandums (sic) signed by the parties.

"In consideration of the foregoing the owner covenants and agrees to and with the contractor to pay him for the construction of said building the sum of twenty seven thousand, nine hundred seventy eight dollars ($27,978.00) which shall be due and payable as follows:

"a.  Seven thousand Dollars ($7,000.00) of the contract price shall be due and payable to the contractor when the concrete work for the foundation and basement is completed and the forms removed.

"b.  An additional Five Thousand Dollars ($5,000.00) shall be due and payable when the outside walls are up and the roof is completed.

"c.  An additional Five Thousand Dollars ($5,000.00) shall be due and payable when the plastering is completed.

"d.  The balance of the contract price, less the amount of Five Hundred Dollars ($500.00) shall be due and payable when the house is completed.

"e.  The amount of Five Hundred Dollars ($500.00) mentioned above in item (d.) is withheld as a guarantee that the materials and wormanship (sic) on this contract will be satisfactory and for the protection of the owner in case any defects that may show up or develope (sic) within three months after the completion of this contract, which the contractor agrees to correct, at his expense.

"f.  The withheld amount of Five Hundred Dollars ($500.00) becomes due and payable three months after the completion of this contract, under the terms stipulated in item "e".

"The owner shall have the privilege of paying, as part of the contract price, all material bills as they accrue in order to obtain any discounts available, and the amounts so paid, plus the amount of such discounts, shall be credited on that portion of the contract price next accruing, as provided for in the preceding paragraph. This provision particularly pertains to lumber

and all materials purchased from the Riverton Lumber Company, on which a 5% discount is to be allowed and on the M. J. Gilpatric (sic) Construction Company's contract on which a discount of 5% is to be allowed and on the heating unit on which a 10% discount is to be allowed, if paid for at the end of each calendar month.

"The contractor is to have the building fully insured as the construction of same proceeds.

"Any and all materials left over from the construction of the house are to be returned to the seller of same for the credit of C. Wimpenney, owner.

"Included in this contract are the following items: All cabinets — Book cases — Kitchen table

Flower beds in and out of house, Mail, Milk and paper recepticals (sic)
Fence — Cement curb on alley side so as to avoid hand triming (sic)
Cement slab for incinerator — Side Walk to alley — Clothes line
Sod removal to fill in where tree stumps were.
Lawn to be graded all ready for seeding.
Copper to be used for all plumbing.
Copper for all screening.

"ALLOWANCES FROM ORIGINAL CONTRACT PRICE

"For garage not being sealed as originally planned will be $114.24

"NOTE — In the event that the owner decides to have the garage sealed as discussed with the contractor it will be done at $114.24 the amount allowed above for the non-sealing.

"Not included in original contract price

"Removal of tree stumps in front of house.

"Side walk repairs — one slab in front of both lots in outside walks.

"Extra cost of asbestos shingles over cedar will be $99.00 which allows for painting sav.

"Extra cost to screens and breaseway (sic) with copper screens and doors will be $87.00

"Extra cost for shower bath up stairs complete will be $212.00

"IN WITNESS WHEREOF THE PARTIES HAVE HEREUNTO SUBCRIED (sic) THEIR NAMES AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN.

/s/      C. Wimpenney      OWNER
/s/      George Lasich      CONTRACTOR"

Attached to this contract was a Federal Housing Administration printed form entitled "Description of Materials," generally used at that time, and signed by George Lasich, the contractor. Both the contract and the form entitled "Description of Materials" were offered in evidence by Lasich and came into the record as part of his case.

The consequence was that no less than nine mechanics' lien statements were filed in the Clerk's Office of Fremont County against Lasich as contractor and Wimpenney as owner. As required by law, nine actions were instituted in the District Court of Fremont seeking foreclosure of the liens and sale of Wimpenney's property. To these actions Lasich and Wimpenney filed separate answers—Lasich as contractor and Wimpenney as owner. Each of these suits contained two separate causes of action. The first cause of action was directed against Lasich for materials and labor supplied him for the construction of the house aforesaid, and the second against both Lasich and Wimpenney for the foreclosure of liens against the Wimpenney property. To these actions Wimpenney filed answers which were substantially similar in each case. Lasich also filed an answer to the petitions in these actions wherein he admitted that the several lien statements of account were correct and that they were owing to the several plaintiffs. Wimpenney in his answers to these foreclosure petitions requested that the lien rights of the representative plaintiffs in and to his property be determined, that an accounting be had between Lasich and Wimpenney, and that judgment be

entered against Lasich for any amount which might be found to be due the lien claimants. Wimpenney asked also that the nine causes of action be consolidated. The record shows that Lasich also moved for a consolidation of the nine causes. On May 31, 1952, the causes numbered 7957 to and including 7965 were consolidated by an order of court for trial. Lasich filed a written demand for a trial before a jury of the issues arising between him and Wimpenney in these several consolidated causes. This demand was accompanied with the deposit of a jury fee of twelve dollars as directed by law. However, the request for a jury trial of the consolidated actions was denied by the court as being not filed at the time required by the order of court for filing the reply in the case.

There were a number of other pleadings, but the ultimate result was that judgment was entered on Lasich's answer acknowledging the plaintiffs' claims for labor and materials were correct. The second causes of action as they pertained to Wimpenney were dismissed. Lasich was directed by the court to file a new petition in the consolidated causes, and Wimpenney was ordered to answer this petition within a fixed time. The order also provided for the setting of the cause for trial on June 10, 1953. This date was subsequently changed to June 16, 1953. At that time the issues between the parties were tried before the court without a jury. The petition of Lasich, ordered to be filed as aforesaid, contained four separate causes of action embracing many allegations additional to those set out in his cross-petition which had been filed in connection with his answer to the petitions of the plaintiffs, the lien claimants, and to the separate answer of Wimpenney. The third and fourth causes of action appearing in Lasich's petition filed pursuant to the court order aforesaid were based upon the theory of *reason-*

*able value* of the services in supervising the purchase of the house furnishings and their arrangement in the new house and also the *reasonable value* of Lasich's services in overseeing the construction work in erecting the new house for Wimpenney. These services were either to be rendered gratis or were included in the amount agreed upon in the formal written contract executed by both Lasich and Wimpenney. As will appear subsequently herein, counsel for Lasich insisted that the parties had abandoned or abrogated that written contract. The trial court rejected this view of Lasich's counsel and found that the written contract had not been abandoned or abrogated. See discussion of the matter infra. Wimpenney filed an answer to this petition of Lasich's and at the same time filed a cross-petition against Lasich. To this pleading Lasich filed a reply and also an answer to Wimpenney's cross-petition.

As above stated, the cause was tried by the court and Findings of Fact and Conclusions of Law were made; and an accounting was also embodied as between Wimpenney and Lasich in the judgment which followed these findings and conclusions. The court found for the plaintiff, Lasich, in the sum of $1,201.51 on his first cause of action, $175.00 on his second cause of action, and dismissed his third and fourth causes of action. From this judgment Lasich has appealed to this court by the direct appeal procedure. The defendant, Wimpenney, also appealed from this judgment; as a consequence of which, there were two cases filed in this Court based on the same record.

It is strenuously insisted on behalf of Lasich that the District Court committed prejudicial error by denying Lasich's demand for a jury. The District Court's reason assigned for doing so was that this request was not timely filed. So far as we can tell from

the confused state of the record before us, the trial court was right in its assigned reason for denying a jury trial. But aside from this, the case as finally developed appeared to be one for the foreclosure of certain mechanics' liens; and, also, an accounting between Lasich and Wimpenney was involved concerning these matters.

Our mechanic's lien law was in large measure taken from that of the State of Missouri. In Becker v. Hopper, 23 Wyo. 209, 147 P. 1085, 1086, Mr. Chief Justice Potter said:

". . . while our mechanics' lien statute, as heretofore declared by this court, appears to have been taken from Missouri, the section of our statute with reference to parties in an action to enforce the lien is not the same as the corresponding section of the Missouri statute, but, instead of the provision that 'the parties to the contract' shall be made parties, it is declared by our statute that 'the parties to the controversy shall *** be made parties.'"

In Huggins v. Hill, Mo., 236 S. W. 1051, 1053, a mechanic's lien case, the Supreme Court of Missouri pointed out that:

"The statute under which this suit was brought makes the case one in equity. Laws of 1911, p. 314. Not only so, but the case is (without the statute) one in equity, because one of its purposes is to have the court determine priority of liens. So that, not only by the terms of the statute, but by the subject-matter of the suit, this case is one in equity ,and to its hearing here we must apply the rules of equity in such appeals."

In Rust Sash and Door Company v. Bryant, Mo. App., 124 S.W.2d 544, 549, also a mechanic's lien case, the Kansas City Court of Appeals of Missouri cited Huggins v. Hill, supra, and said:

"This is a proceeding in equity in every sense of the word and for every purpose. Huggins v. Hill, Mo.Sup., 236 S.W. 1051, 1053."

In Selfridge v. Leonard-Heffner Machinery Co., 51 Colo. 314, 117 P. 158, 159, the Supreme Court of Colorado remarked that:

"Proceedings to foreclose mechanics' liens are in their nature equitable, and are necessarily governed by the rules pertaining to chancery practice."

We find also that 36 Am. Jur. 152, states as concerning the nature and form of remedy relative to mechanics' liens that:

"However, where the distinction between actions at law and suits in equity is maintained, such proceedings are treated as suits in equity, and they are generally treated as being equitable in nature, irrespective of whether the distinction between suits at law and in chancery has been abolished."

It may be well recalled at this point the familiar principle of equity practice as stated by Mr. Justice Van Devanter in Kinney-Coastal Oil Company v. Kieffer, 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961, 967, that: "It is a general rule that a court of equity, in a suit of which it has and takes cognizance, may administer complete relief between the parties, even though this involves the determination of legal rights which otherwise would not be within the range of its authority."

The court last mentioned in Sheffield Furnace Company v. Witherow, 149 U.S. 574, 579, 13 S.Ct. 936, 37 L.Ed. 853, speaking through Mr. Justice Brewer, also said:

"And the foreclosure of a mechanics' lien is essentially an equitable proceeding. As said by *Mr. Justice* Field, speaking for the court in *Davis* v. *Alvord*, 94 U. S. 545, 546 (24:283, 284) : 'It is essentially a suit in equity, requiring specific directions for the sale of the property, such as are usually given upon the foreclosure of mortgages and sale of mortgaged premises.' "

Additionally, we may observe that 1 Am. Jur. 297 declares that:

"An action for an accounting under the code system of procedure usually invokes the equity powers of the court."

So 1 C.J.S. 645 asserts that:

"Jurisdiction in matters of account proper for an action of account was originally exercised exclusively by courts of law, but owing to the inadequacy of the remedies afforded by the ancient common-law action of account, and the delay and expense involved in such action, courts of equity early assumed jurisdiction, and in some states the statute expressly confers jurisdiction on equity in matters of account. Such jurisdiction is now firmly established and is based on the inadequacy of the remedy at law."

We conclude there is no merit in this contention on the part of Lasich.

It should not be overlooked that we are obliged to view this record of nearly a thousand pages of testimony and exhibits in the light of certain rules which this court has in time past frequently announced and followed when a party defeated in the trial court has brought the case here for review, viz., quoting from an earlier case in Jacoby v. Town of City of Gillette, 62 Wyo. 487, 174 P,2d 505, 506, this was said:

" '. . . it must be borne in mind that the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it.' " (See also other decisions of this Court there listed.)

It should be remembered also that in Christensen v. McCann, 41 Wyo. 101, 282, P. 1061, 1062, it was announced that:

". . . under the familiar rule of appellate procedure, so often adverted to by this court, we can only look into the record to see if there is substantial evidence therein to support the findings of the court below. If there is, we cannot review the facts, even though, were we hearing the case originally, we might feel inclined to come to a conclusion different from that reached by the trial court."

Counsel for appellant further insist that the written contract signed by both Lasich and Wimpenney was abrogated by the parties. We are inclined to think that in taking this position counsel for appellant are mistaken for several reasons.

In its findings of fact, the trial court held that:

"Said house was constructed under said contract and said contract was never abandoned by the parties."

And 17 C. J. S. 1229 states that:

"One asserting that a contract has been abrogated by agreement has the burden of proof."

The trial court evidently thought that this essential proof did not appear in the record. There is certainly plenty of evidence in the record to sustain the view adopted by the trial court.

We should not overlook that this Court itself has had occasion to say in Snowball v. Maney Bros. & Co., 39 Wyo. 84, 270 P. 167, 171, that:

"This court has already clearly laid down what the rule should be as to the continued existence of a written contract which provides for alterations, when the work under the contract as altered has been carried out." (Citing Hood v. Smiley, 5 Wyo. 70, 36 P. 856.)

This cited Hood v. Smiley case involved a building contract. Changes were made in the plans and specifications, and these were followed in erecting the building. As in the case at bar, the contractor claimed that

the original written contract was abrogated and did not sue upon it but upon a quantum meruit. This Court declined to adopt the contractor's view of the matter, and this was said (36 P. 856, 857):

"The plaintiff in his reply admitted the making of the contract, and upon the trial introduced in evidence the plans of the house he had agreed to erect. Under such circumstances, the presumption is that the contract continued until something to the contrary was shown. It is the common experience of men that changes and alterations in the original plans and specifications of buildings are the rule, and not the exception, and the legal rule seems to be well established, as stated by counsel for plaintiff in error, 'that where additions are ordered to be made, and are made, to a building which a workman has contracted to furnish for a certain sum, the original contract is held to exist as far as it can be traced to have been followed, and the excess must be paid for according to its reasonable value;' and it is only where the alterations and changes are so great that it is impossible to follow the original contract that it will be deemed to have been wholly abandoned, so that the contractor can recover upon a quantum meruit. So long as it can be traced, it is binding upon both of the parties, and, when once shown to have existed, the burden is upon the party who claims its abandonment, and thereby seeks to lay down another measure of the value of the work than that agreed upon by both parties to the contract. It is, we think, entirely clear from the record that the court did not conclude from the evidence that the original contract had been abandoned, and we are of opinion that this conclusion was entirely authorized by the testimony of plaintiff alone."

So the recent text 9 Am. Jur. 50, considering the subject of building contracts in accord with the rule given in the Hood case, supra, states that:

"When a building is in process of construction, and additions or alterations are made, the original contract, unless it be so entirely abandoned that it is impossible to trace it and say to what part of the work it

shall be applied, is held still to exist, and to be binding on the parties so far as it can be followed. The additions or alterations, if the expense of the work is thereby increased, may be the subject of a new contract, either express or implied, but they do not affect the original contract, which still remains in force."

Accordingly, we have reached the conclusion that appellant's counsel were mistaken in adopting the view that the written contract signed by Lasich and Wimpenney was abrogated and abandoned. We think that counsel were in error, therefore, in presenting their proofs on that theory, although we find in their brief this statement:

"Only one question is now or ever has been presented in this case: What are the rights and duties of the owner and contractor toward each other with respect to the building, and that question, in turn, is determined by the determination of whether or not the building was constructed under a specific expressed contract or whether the original contract was abandoned by the parties and an implied contract substituted in its place. That question determined, all of the remainder of the case falls into place."

Appellant asserts also that when Wimpenney paid the amount due the contractors and material men the amounts for which these parties were given judgments by the court Lasich as joint obligor was released from his liability under them and accordingly the judgment cannot stand. We fail to see how Lasich can be regarded as a joint obligor in a judgment undertaking to foreclose a mechanic's lien under our law. It is not a proceeding in personam but in rem. 57 C.J.S. 1002 states that:

"A judgment or decree in a mechanic's lien proceeding, in so far as it declares and authorizes the enforcement of a lien on the property involved, is to be regarded as a judgment in rem against the specific property; a judgment in personam only, and not in rem, is not sufficient to establish the lien."

The same text, 57 C.J.S., also says at page 873:

"A mechanic's lien proceeding, in so far as it is directed primarily to charging the particular property with the lien, is generally regarded as a proceeding in rem, or as a proceeding which is quasi in rem, or in the nature of a proceeding in rem, and does not require a judgment in personam."

We observe appellant's brief asserts that:

"... *no dispute existed as to correctness of the amounts due lien claimants in these several suits.* Had Appellant been financially able they would have been paid and final accounting had with the owner. No dispute is made of the fact that any amounts paid by the owner in these respects would have been taken into account in any final settlement." (Italics supplied.)

It is apparent that Lasich could not pay the bills he incurred in connection with the house he was employed to erect; that being so, it is likewise evident that Wimpenney in paying the amounts due for labor and materials followed the only course open to him to protect his property. That he could do this and enforce the rights he had acquired against Lasich is reasonably clear in both law and logic (see C.J.S. citations, supra). 36 Am. Jur. 171 is in accord with the Wyoming citations above set forth, for that text says:

"A judgment entered on a mechanic's lien has the characteristics of a judgment in rem."

At this point, we should remember that paragraph number four of the written contract aforesaid executed by both Lasich and Wimpenney states:

"4. LIEN CLEARANCE. Upon completion of said building the contractor will furnish satisfactory evidence that all materials and labors have been paid in full before final payment under this contract shall be due."

Concerning the rights of Wimpenney in paying off Lasich's obligations in order to protect Wimpenney's

property, the case of Bagaglio v. Paolino, 35 R.I. 171, 85 A. 1048, 44 L.R.A. (NS) 80, is instructive. That was a mechanic's lien case presenting some features resembling those of the case at bar. A statement in the court's opinion is, we think, of aid here; and we quote it as follows:

"The plaintiffs, husband and wife, on January 4, 1911, entered into a written contract with the defendants for the construction of a house, upon land owned by the plaintiffs in the town of Barrington, for the sum of $2,000. Under the terms of the contract the house was to be completed by April 30, 1911.

"The contract also provided for the payment of the contract price in four installments of $500 each; the first three payments to be made, from time to time, as the work progressed, and the last payment when the house was completed. The plaintiffs made two payments to the defendants, the first of $500 and the second of $400; a deduction of $100 having been allowed by the defendants on account of unsatisfactory work. The house was not completed by April 30, 1911. After waiting a month, observing the disinclination of the defendants to finish it, and learning that they had not paid for the lumber and materials already used in the construction thereof, and that some of the creditors of the defendants had filed, and others were contemplating the filing, of liens for the recovery of the amounts due them, the plaintiffs notified the defendants to proceed no further with the work, and thereupon undertook to finish the same themselves as nearly in accordance with the original plans as the work already done would permit, and to discharge such liens as had been placed upon the property and pay such claims as might be made the basis of liens thereafter."

While the appellate court reversed the judgment below in that case because the correctness of the claim for labor and materials had not been established— as it has been in the case at bar—the Supreme Court of Rhode Island nevertheless said:

"Undoubtedly the plaintiffs would have the right to discharge a perfected lien—that is, one which had been carried to a final judgment—and charge the amount paid to the defendants. In the case at bar the defendants had placed the plaintiffs in a most embarrassing position through their failure to pay for the materials and labor furnished them in the construction of the house which they had contracted to build and had left the plaintiffs to get out of their difficulty as best they could. Under these conditions the plaintiffs must either discharge such claims for material and labor as might be the subject of liens ,or suffer all the losses and disadvantages of delay, together with the additional burden of further expenses which would be incurred in perfecting the liens, for all of which the defendants might be financially irresponsible. We think that in this situation the plaintiffs might pay such claims as would be collectible through lien proceedings, and charge the same to the defendants. The plaintiffs, however, in settling such claims must limit each payment to the amount justly and fairly due the claimant. They cannot charge to the defendants anything more than the defendants were legally obligated to pay themselves. In order for the plaintiffs to recover for such payments, it is incumbent upon them to establish the justness of the claims."

Complaint appears to be made that no satisfactory allowance was given by the trial court to Lasich for his services on the trips Lasich and his wife took with Mr. and Mrs. Wimpenney to St. Paul, Minnesota, and to Casper, Wyoming; but we think the district court disposed of that matter very justly. These people were absent approximately a week from Riverton on the St. Paul trip. The trip to Casper and return was made in one day. All the expenses (including hotel bills, meals, furnishing transportation by car and fuel, of Lasich and wife as well as those of Wimpenney and wife) were paid by Wimpenney. The trips were obviously taken merely as pleasure and vacation trips. Yet, we find Lasich in his second cause of action claiming that he should be awarded $2,000 for these services. Really,

as it seems to us, the trial court awarded a most generous amount for the two men's work for two or three days in moving and uncrating the furniture purchased. Mrs. Wimpenney, a married woman with some forty-seven years' experience in purchasing household furniture, said she selected the furniture and house furnishings. She would hardly have relied on having a contractor with no experience except as a garage man to select furniture to be used in her new house. She made a list of furniture needed and where it was to be placed in the home. Lasich testified he had never been employed for a fee to do work of this character. We deem the point suggested as without merit.

Other points are urged on this appeal; but we have, we think, disposed of the main contentions of the appellant. And the record here is so confused in many places that when the rules of appellate procedure in regard to what this Court should consider are invoked (especially bearing in mind the trial court's action on conflicting testimony and the testimony in evidence on behalf of the respondent which is to be deemed controlling) there is no need to say more on the contentions advanced on this appeal.

## CASE NO. 2638

Since this appeal is grounded upon the same record as number 2634, it will be unnecessary to restate the facts. We will, however, set out the specifications of error. Of these there are only four, and they read as follows:

"1. That the court erred in its findings of facts and conclusions of law in assessing and charging against the defendant the sum of $114.24 for sealing of garage. Record on Appeal, Paragraph 6, pages 261-262.

"2. That the court erred in assessing and charging the defendant the sum of $140.00 for four garage doors. Paragraph 7 of the record on appeal, page 262.

"3. That the court erred in allowing the sum of $16.11 made by the defendant to Jewett Machine Shop, whereas the amount to which the defendant is entitled to credit and which amount was paid by him is the sum of $63.11. Paragraph 9, page 263, Record on Appeal.

"4. That the court erred in disallowing the claim of the defendant against the plaintiff amounting to $492.80, paid to one Don Loebe for painting in accordance with the terms of the contract between the plaintiff and defendant as set out and shown at page 263, Record on Appeal, paragraph 11."

In considering these assignments, we, of course, must employ the same rules of appellate procedure quoted above in our disposition of Case Number 2634; and it will not be necessary to repeat them in the disposition of this appeal.

With regard to specification number one, it is only necessary to refer to the written contract to reach the conclusion that this assignment of error is not well founded. It will be recalled that near the close of the written contract we find these indorsements:

## "ALLOWANCES FROM ORIGINAL CONTRACT PRICE

"For garage not being sealed as originally planned will be $114.24.

"NOTE—In the event that the owner decides to have the garage sealed as discussed with the contractor it will be done at $114.24 the amount allowed above for the non-sealing."

These statements appear just above the signatures of Lasich and Wimpenney to the written building contract. It is evident the court below was warranted in doing what it did do and that its action was in accord with the understanding of the parties.

With reference to the charge of $140 for four garage doors, the record shows that Wimpenney had Lasich put up those doors and they met with Wimpenney's approval. We see no reason why Wimpenney should not pay for them, especially as no labor charge was made for installing the doors.

The amount due the Jewett Machine Shop was obviously a mistake on the part of the court as the amount referred to in the evidence in the record, and which Wimpenney paid, was $63.11 instead of $16.11. This error is very likely merely a typographical error.

Concerning the fourth and last assignment, it appears that the specifications relative to materials and exterior painting (which Lasich himself signed and which were attached to the contract hereinabove set forth) read "exterior painting, number of coats, 3; material, paint; manufacturer and brand, Sherman (sic) Williams." In order to complete the work which Lasich should have done, it is evident that three coats of paint should have been put on the house. As Lasich put on only one coat, it is apparent that Wimpenney employed a painter to do what Lasich should have looked after himself. This was the only course left open to Wimpenney as at the time the painting was done Lasich and his workmen had left the job and were no longer engaged in undertaking to complete the house. For that reason, Wimpenney, as we think should have received credit for the $492.80 which he paid to Don Loebe for this job of painting.

With these modifications as above noted, we reach the conclusion that the judgment of the District Court of Fremont should be affirmed. We are the more ready to reach this conclusion when we bear in mind the statement in appellant's brief in Case Number 2634 to the effect that ". . . in view of time which has elap-

sed and procedure which has taken place, in the interest of basic and substantial justice, retrial should be avoided if the rights of both parties can be adequately preserved." And we are obliged to say that the Judge of the District Court who had to study and express his conclusions concerning this very elaborate and involved record did very well in determining the rights of the parties, and all things considered we agree with counsel for the appellant in Case Number 2634 that the rights of the parties should be and have been very well preserved.

*Modified and affirmed.*

BLUME, J., AND HARNSBERGER, J., concur.