**VITRO MINERALS CORPORATION,**
Appellant (Defendant below),

v.

**SHONI URANIUM CORPORATION,** Appellee (Plaintiff below).

No. 3166.

Supreme Court of Wyoming.

Nov. 21, 1963.

Hettinger, Leedy & Harrington, James L. Hettinger, Riverton, Senior & Senior, Salt Lake City, Utah, for appellant.

G. Joseph Cardine, Casper, for appellee.

Before PARKER, C. J., and HARNS-BERGER, GRAY, and McINTYRE, JJ.

Mr. Chief Justice PARKER delivered the opinion of the court.

Shoni Uranium Corporation brought an action against Vitro Minerals Corporation alleging breach of a written agreement in which Vitro had been granted certain mining rights on Shoni claims. Upon trial the court found generally for plaintiff as to the breach of the agreement and that Shoni was entitled either to elect payment of advance royalty or to termination of the agreement and when plaintiff elected the former gave judgment for $60,000 plus costs and interest.

A basic question both in the trial court and here was whether or not Vitro had made a determination under Article VII of the agreement which would have caused Article V to become operative, in the light of the first two clauses of Article IX. The mentioned sections read as follows:

"ARTICLE V. MINIMUM SHIPMENTS AND ORE PAYMENTS.

"* * * Vitro will ship a minimum of uranium ore mined from the Shoni Claims to assure Shoni of a minimum payment of $10,000 per calendar quarter. In the event Vitro fails to make such minimum shipments, it shall pay Shoni an advance royalty as though such shipment were made. Any ad-

vance royalty made by Vitro over and above the actual shipments made for such period shall be used to offset the monies due from the sale of ore during succeeding months in excess of the minimum shipments. These minimum shipments of ore from the Shoni Claims and minimum advance payments shall commence within 6 months after a commercial ore body, as defined in ARTICLE VII, is blocked out on such claims, shall cease upon the exhaustion of such commercial ore body and shall commence again within 6 months after the discovery of another commercial ore body or ore bodies."

"ARTICLE VII. COMMERCIAL ORE BODIES.

"A commercial ore body is defined as mineralization of at least .20% U308 with a ratio of overburden to the ore (.20% U308) of not exceeding 10 to 1 and at a depth of not exceeding 80 feet. The recoverable tonnage on the 10 to 1 ratio shall be at least 5,000 tons at a total average depth of not over 50 feet or 10,000 tons at a total average depth of not over 60 feet or 25,000 tons at a total average depth of not over 80 feet. Mining depth and ratios shall be subject to determination exclusively by Vitro. Vitro shall in its discretion also determine whether ore bodies with deeper overburden than that specified above constitute commercial ore bodies. The minimum ore grade for any commercial ore body shall be .20%, but Vitro agrees to blend higher grade ore with lower grade ore from the same ore body, if possible for the purpose of attaining the maximum recoverable tonnage in any ore body."

"ARTICLE IX. MINING PRACTICES.

"Vitro shall exercise diligence in the conduct of prospecting and mining operations; shall carry on development and operations in a workmanlike manner and to the fullest possible extent shall commit and permit no waste on the Shoni Claims except such as may result from its operations under this Agreement * * *."

■ Since defendant rested at the conclusion of plaintiff's case, the only evidence before us is that presented in substantiation of the complaint. Reports of Vitro to the Atomic Energy Commission were admitted subject to defendant's objection that they were irrelevant, immaterial, and had no relation to any issue of the cause. We think the court's ruling on the admission was proper. It is apparent that these disclosures to the commission shed some light upon Vitro's appraisal of the property, and even though they do not relate directly to any determination, they have a distinct bearing upon the good faith and due diligence of defendant and tended to prove that the defendant considered the property to be valuable, worthy of development, and sufficiently important to make a favorable report to the commission. It is argued that Adamson, Vitro's geologist, and Whitley, its mining engineer, were not persons entitled to make a determination for defendant that the property in question contained "commercial ore bodies." Since an answer to this is requisite only if the evidence disclosed that these employees purported to determine that a commercial ore body existed, we will consider that aspect first.

Adamson in his report made no analysis in the light of commercial feasibility or profit. Although he found that an ore deposit on two of the claims (Blackstone 6 and 7) contained a minimum of 109,105 tons of .535 percent $U_3O_8$ recoverable ore having a dollar value of $4,669,694, he indicated that the ore occurred from 570 to 770 feet below the surface and therefore was an underground mining proposition. Admittedly, he made numerous statements which reflected the inherent value of the deposit, both as to the proven ore and the potential. He stated:

"Blackstone 6 and 7 and the immediate surrounding area, especially to the east offer a good potential for high grade

uranium ore reserve. The Blackstone deposit is essentially open on the north, south, east, and in several places on the west side. Considered on the basis of present reserve, it is comparable to many of the better ore bodies in Wyoming and has a potential of being one of the best in respect to contained pounds of uranium."

"In the event that additional ore reserves are considered necessary to prove the economics of this deposit, many drill sites could be selected that could expand reserve appreciably. Location of additional holes of this nature is readily seen upon examination of the mineralization map. It is recommended that if these holes are drilled that they be drilled on 100 foot centers stepping out from the known ore body."

Nevertheless, his report, viewed in the most favorable light to plaintiff, can scarcely be said to constitute a determination of a "commercial ore body" as mentioned in the agreement.

Whitley addressed himself to the problem of profit and commercial feasibility. He employed as a basis for his written analysis to his employer the report submitted by Adamson,[1] and discussed at some length the mining possibilities both good and bad, including open pit mines. His study indicated a profit of $342,745 on a five-year operation in which the expense would be $4,895,515.[2] If his reasoning was correct, the conclusion which he made would seem to be justified, "The percentage of indicated profit, 7 percent, that may be realized from the Blackstone underground mining venture certainly does not warrant the expenditure that is required."

Unfortunately, the words "commercial ore body" as they are used by the parties with reference to deposits more than eighty feet in depth have no well accepted meaning and so far as we are advised have never been determined in litigation. Plaintiff concedes the words to mean such concentration as would be profitable but hedges on the percentage. Defendant refers to "workable," "available," "merchantable," and "mineable," as being somewhat similar, points out that the latter two are employed by the parties in Article I of the agreement, and urges that under a proper interpretation of the agreement a commercial ore body means mineralization to the extent that a reasonable and prudent miner would be justified in spending money, work, and labor in recovering same and receive a reasonable profit on his investment. In determining what the parties intended, we cannot ignore the fact that in defining a commercial ore body in depths of less than eighty feet the parties agreed that the ratio of recoverable tonnage should increase according to the depth. This arrangement would seem to have contemplated a reasonable profit to the party conducting the mining operations. Therefore, we can approve neither the oral statement of the trial court to the effect that the amount of profit which Vitro would receive was unimportant nor the finding that "defendant made a discovery of a commercial ore body." In so concluding, we have not ignored the testimony and exhibits indicating the possibility that there exists to the north and south of the already explored portions of Blackstone 6 and 7 other deposits that would in effect make this particular body commercial. Shoni, however, did not bring its case on the ground of fraud nor charge an abuse of discretion on the part of Vitro; thus, this matter is not in issue.

There is nevertheless before us the finding of the trial court that defendant failed for more than six months prior to notice of termination to carry on operations under the agreement, which agreement provided in Article XIII that "Shoni shall have the

---

1. Adamson's figures had been corrected for an apparent mathematical error so that the reserves were shown to be 118,000 tons of .495 percent $U_3O_8$ recoverable ore, having a dollar value of $5,195,360.

2. After the suit had been commenced, Whitley on the basis of additional information from Adamson revised his figures to show a loss of $651,396 instead of a profit.

right to terminate * * * in the event that: * * * Vitro fails for a period of 6 consecutive months to carry on operations * * *." Evidence concerning this aspect was proper under the amended complaint. Shoni's original pleading was filed January 17, 1961. At that time its position was that there had been a determination of a commercial ore body by Vitro and that advance royalty payments were due. On November 27, 1961, Shoni advised Vitro of its intention to terminate the agreement, one of the grounds being that Vitro had failed for a period of six consecutive months to carry on operations. On January 16, 1962, Shoni filed an amended complaint, count one thereof reiterating its original claim and count two stating that the notice of termination had been received by Vitro on November 29, 1961, and asking that the court decree the agreement terminated and restore to plaintiff the leased claims and properties in question.

Counsel for defendant relies upon the fact that in the six months prior to the notice of termination Vitro in addition to assessment work did 93 hours of office work, 130½ hours of labor, and paid $292.80 to Century Geophysical Corporation for services. The agreement clearly provided that "Vitro shall exercise diligence in the conduct of prospecting and mining operations; shall carry on development and operations in a workmanlike manner * * *." What amounts to due diligence is a question of fact for the trial court, Day v. Kansas City Pipe Line Co., 87 Kan. 617, 125 P. 43. Throughout the argument here, appellant minimizes its lack of operations in the six months prior to the time that notice of termination was given, cites Phillips v. Hamilton, 17 Wyo. 41, 95 P. 846, and states that to December 31, 1961, in addition to $50,000 initial consideration paid to Shoni for the privilege of exploring the property, it had drilled 300 holes, comprising a total footage of 130,762; spent 5,763 hours of engineering time and 1,761.5 hours probing holes and other work; and paid to Century Geophysical Corporation $8,463.16. Vitro insists that

in practically all mining cases where the lessor was allowed to terminate or cancel an agreement or lease largely because no minerals had been produced, upon the theory that the lessee should not be permitted to hold a nonproductive lease, there was no consideration to the lessor other than the expectation of a share in the production or at most a nominal or token consideration, citing Annotation, 60 A.L.R. 901. Although Shoni does point out the inequity of a lessee being permitted to hold a nonproductive lease, this court does not understand its position to have been one asking for termination of the agreement because no minerals had been produced; rather it asked for termination on the ground that Vitro failed to carry on operations for more than six months. Nevertheless, we are impressed by the statement in Annotation, 60 A.L.R. 901 at 925:

"But it has been held that forfeitures, even though expressly provided in a mining lease, for the failure to develop and properly mine, are even less favored than are forfeitures generally, much being left to the discretion of the operator. In the absence of evidence of fraud or bad faith, such forfeitures will not be enforced; for a breach of a covenant properly to work the premises, especially if due to a mistake of judgment only, the wilful default or bad faith of the lessee not being shown, a forfeiture of the lease will not be decreed. * * *"

As we have hereinabove noted, any matter of fraud concerning Vitro's failure to explore to the north and south of the known ore body on Blackstone 6 and 7 was not before the trial court. Under the circumstances of the case, with Vitro not having been charged with failure to carry on operations until after the filing of the suit for advance royalty by Shoni, we are doubtful that bad faith was exhibited to the extent that forfeiture is warranted, and as a matter of equity, this court elects to apply the principle, which has been adopted in a number of cases, that where the minimum

royalties or annual rentals are reasonably substantial in relation to the expected return from the property, they represent in effect an agreed compensation to the lessor for the lessee's failure to observe and perform the duty, express or implied, to implement reasonable production. Annotation, 87 A.L.R.2d 1076, 1078. And see Annotation, 76 A.L.R.2d 721, 724, 748.

■ Although plaintiff at the conclusion of the case was required by the court to "elect" whether to proceed on count one or count two and chose to proceed under one, such election was improper under the circumstances since the remedy under count one was unavailable. As was said in Roberts v. Roberts, 62 Wyo. 77, 162 P.2d 117, 122: If in truth there is but one remedy, and not a choice between two, a fruitless recourse to a remedy withheld does not bar recourse thereafter to the other.

There was substantial evidence that for six months (two calendar quarters) prior to the notice of termination on November 27, 1961, defendant failed to carry on operations, and on the basis heretofore mentioned the plaintiff would be entitled to receive an amount equal to but not greater than the minimum royalty payments for such period. The judgment therefore should be reduced to $20,000 plus such interest and costs as the court may determine.

■ The well settled rule in oil and gas matters is that where a lessor has repudiated a lease by notice or by suit for cancellation because of alleged breach by lessee such act of the lessor relieves the lessee of the duty to continue further operations during the period of uncertainty. Amerada Petroleum Co. v. Doering, 5 Cir., 93 F.2d 540, 542, 114 A.L.R. 1385. In view of the fact that some uncertainty may have existed as to Vitro's obligation to carry on operations after the filing of the amended

complaint, it is equitable that the mentioned rule apply here, provided the company within a reasonable time fulfills its obligation to exercise due diligence in the conduct of operations. We consider it proper that the trial court take such steps as are necessary to see that the views herein stated are effectuated, and to that end retain jurisdiction for such period as it may deem necessary.[3]

Affirmed as modified.

---

3. Where equity has acquired jurisdiction for one purpose, it will retain that jurisdiction to the final adjustment of all differences between the parties arising out of the action presented. Vargas v. Superior Court of Apache County, 60 Ariz. 395, 138 P.2d 287; Yarnell v. Hillsborough Packing Co., 5 Cir., 70 F.2d 435, 92 A.L.R. 1475; and see Lasich v. Wimpenney, 73 Wyo. 345, 278 P.2d 807; 1 Pomeroy, Equity Jurisprudence, § 181 (5 ed.); 19 Am.Jur. Equity § 127; 30 C.J.S. Equity § 67.