**CHEYENNE MINING AND URANIUM COMPANY, a Wyoming corporation, Appellant (Plaintiff),**

v.

**FEDERAL RESOURCES CORPORATION, a Nevada corporation, and American Nuclear Corporation, a Colorado corporation, a partnership doing business under the name Federal-American Partners, Appellees (Defendants).**

No. 83–69.

Supreme Court of Wyoming.

Jan. 21, 1985.

Rehearing Denied Feb. 27, 1985.

B.J. Baker and G.M. Apostolos of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellant.

Houston G. Williams and Barry G. Williams of Williams, Porter, Day & Neville, P.C., Casper, for appellees.

Before THOMAS *, C.J., and ROSE, ROONEY **, BROWN and CARDINE, JJ.

ROSE, Justice.

This contract-interpretation case requires an examination of the impact of unanticipated agreements concerning the subject matter of the contract, which agreements were entered into by the party whose performance is deemed to be due. Appellant Cheyenne Mining and Uranium Company (CMU) brought this action against appellees Federal-American Partners (FAP) and its member corporations, seeking to rescind a contract for the purchase and sale of certain unpatented mining claims, or in the alternative to enforce the contract's terms. During the trial to the district court, the judge ruled that appellant's exhibits, offered to show bad faith on the part of FAP, were inadmissible. Following three and one-half days of testimony, the trial court took the matter under advisement and subsequently entered a judgment awarding CMU $3,306 under the contract provisions, plus accrued interest and costs. On appeal, CMU contends that the trial court's interpretation of the contract improperly limited its award and further asserts that the trial court erred in refusing to admit pertinent evidence and to grant rescission.

We will reverse.

On November 1, 1957, CMU as "Owner," together with named individuals designated "Locators," entered into a "Contract of Purchase and Sale" with Vitro Minerals Corporation as "Purchaser" for the conveyance of unpatented uranium mining claims located in Natrona County. The contract

was subsequently assigned to FAP, which concedes to being bound by its terms.

In executing the contract, the owner and locators agreed to "convey, quitclaim and assign" all interest in and to the mining claims to the purchaser, "under and upon, nevertheless, the terms and conditions hereinafter set forth." The terms and conditions set forth in paragraph 4, relating to owner's participation, are pertinent to this appeal:

"4. OWNER'S PARTICIPATION: For and in consideration of the Assignment and Conveyance to Purchaser of Owner[']s interest, *the Purchaser covenants and agrees to pay to the Owner, its successors, assigns or legal representatives, a sum constituting forty per cent (40%) of the annual net profits from all uranium, vanadium and other associated minerals and ores mined, produced and sold from the property, computed in accordance with and under the terms and conditions hereinafter set forth.* In addition, it promises and agrees to perform a minimum of 20,000 feet of drilling upon the property at such locations and in such manner as may be deemed advisable by it within twelve months after the 15th of July, 1957.

"a. COMPUTATION: *Net profits shall be arrived at by deducting from gross proceeds those items listed upon the schedule of deductions hereto attached as Exhibit A.*[1]

"b. BASIS FOR GROSS PROCEEDS: *Gross proceeds shall include the proceeds from ore sold based upon prices established in Circular 5 Revised, or, in event that such schedule should be supplemented by another, the schedule then in effect or the market price then current for such ore; it shall not include the proceeds from the operation of any concentration or milling opera-*

---

1. Schedule A lists 14 items to be deducted from gross proceeds in computing net profits. These items include the purchaser's costs of survey and exploration, development, transportation, management, labor, supplies, maintenance of equipment, insurance, and depreciation.

*tion* or benefication process which might be erected upon the property or *erected, owned or operated by the Purchaser.*

"c. TIME FOR PAYMENT. Distribution of net profit shall be made quarterly and within thirty days after the close of such quarter. For the purpose of such distributions, such quarterly periods shall end on the last day of March, June, September and December of each year. The Purchaser at its option, may make such distributions at the end of each month. If the quarterly distributions exceed the Owner[']s share of the annual net profits as determined at the end of each calendar year, Owner shall repay Purchaser such excess or Purchaser may deduct such excess from future payments due Owner.

"d. ACCOUNTING: Each distribution of net profit shall be accompanied by a true, correct and complete accounting statement, showing the factors entering into the distribution made, all in accordance with standard accounting practices employed under the schedule hereto attached and with the terms of this instrument.

"GENERAL: The provisions hereinabove made with respect to the Locators for availability and examination of records, statement, or Declaration of Interest, and time and responsibility for payment, shall be applicable to the distribution of net profit to the Owner.

"f. MINIMUM PAYMENT: During this agreement, Purchaser will work the property diligently and in minerlike fashion with the object of discovering, producing and marketing commercial ores. Within sixty (60) days after Purchaser develops a commercial deposit of ore ready for extraction, it shall pay Owner a minimum of Five Hundred Dollars ($500.00) per month as net profits therefrom, which payments shall be a credit upon any and all of Owner[']s share of net profits as herein defined. Such minimum payments shall cease when such ore body has been exhausted unless another ore body has been developed and made ready for extraction. * * *" (Emphasis added.)

On April 27, 1973, FAP entered into two agreements with Tennessee Valley Authority (TVA), which agreements provided for the development of numerous mining properties owned or controlled by FAP in the Gas Hills Mining District, including the claims subject to the 40% annual-net-profits interest held by CMU. The principal agreement, designated "Mining Lease Agreement," contains the following grant:

"A. For and in consideration of good and valuable consideration and of the covenants and agreements herein contained, Lessor [FAP] hereby grants to the Lessee [TVA] and the Lessee's successors and assigns for the term hereinafter provided the exclusive right to explore, develop, mine, extract and remove from the Mining Properties all uranium and other fissionable source materials, including associated minerals, in, on, under, or upon the said properties and thereafter to retain all right title and interest in and to all such severed minerals. Lessee shall also have the right to use so much of the surface of the Mining Properties as may be reasonably required to conduct exploration, development, mining and milling activities."

As consideration to FAP, the agreement specifies in Article III the following royalty payments:

"Lessee agrees to pay Lessor the following royalties:

"A. As concerns 6,000,000 pounds of $U_3O_8$ contained in reserves upon the Mining Properties and presently classified as Indicated Ore, Lessee shall pay Lessor Seven Million dollars ($7,000,000), payable:

"(1) Four Million Five Hundred Thousand dollars ($4,500,000) at closing; and

"(2) Two Million Five Hundred Thousand dollars ($2,500,000) on or before January 1, 1979.

"B. As concerns 2,400,000 pounds of $U_3O_8$ contained in reserves presently classified as Inferred Ore (over and

above the said 6,000,000 pounds referred to in A above), an amount equal to sixty-two and one half cents (62½¢) per pound of $U_3O_8$ in that category determined by March 31, 1975, to be Indicated Ore, up to and until a maximum of One Million Five Hundred Thousand dollars ($1,500,-000) is owed to Lessor. Said royalty payment shall be made on or before March 31, 1975. * * *

"C. A payment equal to fifty percent (50%) of the amount by which the market price for $U_3O_8$ concentrate exceeds the production cost of such concentrates, which cost shall include payments made pursuant to paragraphs A and B above, royalties and similar payments (excluding, however, the royalty to be paid pursuant to this Article III, paragraph C) all outlays by TVA from date of closing to date of delivery of $U_3O_8$ concentrates, plus interest at the rate of seven and one half percent (7½%) per annum, on a non-compounded basis on the above costs, allocated on a per pound basis of delivered $U_3O_8$ concentrates. * * *"

To implement the development of the mining properties contemplated by the mining lease agreement, the parties agreed to a working agreement embodied in the "Interim Agreement." Under this agreement FAP, as contractor, assumed the exclusive right and duty to manage the properties described in the mining lease, to perform exploratory work, and to mill the extracted ore—all on behalf of TVA and at TVA's expense.[2] The interim agreement was replaced one year later by the "Exploration and Milling Agreement, Definitive Agreement," which more fully describes FAP's duties as contractor and the procedure for payment of costs by TVA. The agreement

provides that "all costs incurred in the performance of Authorized Operations * * * shall be at TVA's expense." In describing the end product of these operations, the definitive agreement provides:

"Title to all ore from the Mining Properties fed into Contractor's mill, and all $U_3O_8$ Concentrate derived therefrom, shall remain in TVA."

In October, 1978, FAP began to mine the subject properties in which CMU holds an interest. Between December, 1979, and June, 1980, FAP paid CMU a total of $9,000 in minimum payments called for under paragraph 4f of the contract of purchase and sale. CMU was dissatisfied, however, with the accounting information furnished to it by FAP and in March, 1981, initiated this action. CMU first learned of the series of agreements between FAP and TVA at that time.

The trial court determined that CMU was entitled to 40% of the annual net profits attributable to uranium ore produced from the subject properties between 1978 and 1981. Net profits were calculated by deducting from gross proceeds those items specified in Schedule A,[3] pursuant to paragraph 4a of the contract of purchase and sale. The figures for annual gross proceeds due to uranium ore were extrapolated from the market values of $U_3O_8$ concentrate, using one of the three alternative methods of calculation presented by FAP at trial. The court adopted appellees' method which updated Atomic Energy Commission Circular 5 by incorporating current values of $U_3O_8$ concentrate. This method followed the contract, according to the court, and resulted in CMU receiving

2. The interim agreement contemplated its replacement by an exploration and milling agreement, under which TVA would establish an operating account to cover allowable costs:

"The definitive Exploration and Milling Agreement shall provide that TVA will deposit sufficient sums in an Operating Account from which Contractor may withdraw sums on an accrual basis to cover allowable costs for which TVA is liable pursuant to the definitive Agreement. Until such time as the definitive Agreement is executed, Contractor shall pay

all sums incurred in the performance of its obligations under this contract, including costs of milling TVA ore, making lease rental payments to third parties, and all other costs, from its own funds and shall submit detailed monthly invoices to TVA covering allowable costs incurred during the month in question. Payment for such costs shall be made by TVA within thirty (30) days."

3. Note 1, supra.

its appropriate compensation of $3,306 in addition to the $9,000 in minimum payments already received.

CMU challenges the trial court's conclusion in two respects: (1) the calculation of net profits based solely on the tonnage of uranium ore mined and milled between 1978 and 1981 denies CMU the right to participate fully in its pro-rata share of the $7,000,000 in advance royalties paid to FAP under Article IIIA of the mining lease agreement; and (2) the calculation of gross proceeds attributable to uranium ore using a formula purportedly designed to escalate Circular 5 to current values is contrary to the express terms of the contract and to the intent of the parties to apportion to CMU its fair share of the profits derived from the uranium claims. In addition, CMU asserts that it is entitled to rescind the contract for purchase and sale as a result of FAP's bad faith in failing to proceed in a diligent and minerlike fashion to produce commercial ores, failing to account and failing to timely distribute proceeds. We will hold that, under the terms of the contract of purchase and sale, CMU became entitled to participate in its pro-rata share of the $7,000,000 in advance royalties when they were paid to FAP and, further, that a proper calculation of gross proceeds attributable to uranium ore requires deducting commercial milling rates from the market value of $U_3O_8$ concentrate. Finally, we will hold that the trial court erred in denying CMU the opportunity to present evidence going to the bad-faith performance of FAP for the purpose of establishing grounds for rescission.

## CONTRACT INTERPRETATION

We repeated the basic purpose and general rules of contract interpretation in *Amoco Production Company v. Stauffer Chemical Company of Wyoming,* Wyo., 612 P.2d 463, 465 (1980):

"Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. *Fuchs v. Goe,* 62 Wyo. 134, 163 P.2d 783 (1945); *Shellhart v. Axford,*

Wyo., 485 P.2d 1031 (1971); *Oregon Short Line Railroad Company v. Idaho Stockyards Company,* 12 Utah 2d 205, 364 P.2d 826 (1961). If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract. *Pilcher v. Hamm,* Wyo., 351 P.2d 1041 (1960); *Fuchs v. Goe,* supra; *Hollabaugh v. Kolbet,* Wyo., 604 P.2d 1359 (1980); *Wyoming Bank and Trust Company v. Waugh,* Wyo., 606 P.2d 725 (1980). And the contract as a whole should be considered, with each part being read in light of all other parts. *Shepard v. Top Hat Land & Cattle Co.,* Wyo., 560 P.2d 730 (1977); *Rossi v. Percifield,* Wyo., 527 P.2d 819 (1974); *Shellhart v. Axford,* supra; *Quin Blair Enterprises, Inc. v. Julien Construction Company,* Wyo., 597 P.2d 945 (1979). The interpretation and construction is done by the court as a matter of law. *Hollabaugh v. Kolbet,* supra; *Bulis v. Wells,* Wyo., 565 P.2d 487 (1977); *Shepard v. Top Hat Land & Cattle Co.,* supra."

A more recent case to the same effect is *Rouse v. Munroe,* Wyo., 658 P.2d 74 (1983).

■ In interpreting a conveyance of a mineral interest, the court may augment these general rules by considering pertinent, extrinsic factors. In *Dawson v. Meike,* Wyo., 508 P.2d 15, 18 (1973), we said:

"* * * [W]e find no fault with * * * the authority of *Houghton v. Thompson,* 57 Wyo. 196, 115 P.2d 654, that to interpret a contract for the conveyance of an interest in oil and gas the court should consider not only the terms of the writing but also the surrounding circumstances, attendant facts showing the relations of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract.

See also *Picard v. Richards,* Wyo., 366 P.2d 119 (1961). The basic purpose of contract interpretation—to determine the intention of the parties—remains the same,

however, regardless of the form of the agreement. *Dawson v. Meike*, supra.

With the foregoing principles in mind, we attempt to ascertain the probable intention of the parties in entering into the contract involved in this appeal, had they envisioned the manner in which the uranium ore was actually transferred—that is, all rights to the ore were sold *prior* to its being mined and produced. We note that no dispute as to any material fact exists between the parties. All mining and milling data were supplied by FAP and accepted by CMU at face value. Accordingly, our resolution of the issues on appeal turns solely upon the proper means of implementing the original contract in light of the subsequent disposition of its subject property.

## ADVANCE ROYALTIES

■ The mining lease agreement dated April 27, 1973, provides in Article III for TVA to pay FAP $7,000,000 for 6,000,000 pounds of $U_3O_8$ contained in reserves classified as indicated ore, or $1.17 (rounded to the nearest cent) per pound of contained $U_3O_8$. These royalties were payable in two lump sums—$4,500,000 at closing and $2,500,000 on or before January 1, 1979. The nature of these payments as advance royalties is made clear in Article IIIC of the mining lease agreement, which specifies that the $7,000,000 is to be amortized as a "production cost" in computing the proceeds owed to FAP on each pound of delivered $U_3O_8$ concentrate. Thus, FAP retains the advance royalties, regardless of the success or failure of a particular mining claim, but royalty payments on delivered $U_3O_8$ are reduced by $1.17 (rounded to the nearest cent) per pound until 6,000,000 pounds of $U_3O_8$ have been profitably recovered.

Testimony at trial indicated that of the 6,000,000 pounds of contained $U_3O_8$ specified in Article IIIA of the mining lease agreement, 163,500 pounds were located in those properties subject to CMU's 40% interest. CMU contended at trial and urges on appeal that, under the 1957 contract of

purchase and sale, it is entitled to a 40% share of $190,739,[4] or $76,295.

The contract of purchase and sale provides that CMU is entitled to 40% of the annual net profits from all uranium "mined, produced and sold from the property." Under the express language of the contract, FAP's obligation to distribute net profits is conditioned upon the sale of mined and produced ore. Accordingly, appellees assert that CMU is not entitled to participate in the advance royalties which were paid prior to mining, production and sale of uranium ore.

The language in the mining lease agreement, as well as surrounding circumstances, leads us to conclude that the agreement constituted a *sale* of ore to TVA, notwithstanding the document's designation as a lease. Under the mining lease agreement FAP granted to TVA

" * * * the *exclusive right* to explore, develop, *mine, extract and remove* from the Mining Properties all uranium and other fissionable source materials, * * * and thereafter to retain all right title and interest in and to all such severed minerals." (Emphasis added.)

The Pennsylvania Supreme Court in *Gilberton Fuels, Inc. v. Philadelphia & Reading Coal & Iron Co.*, 342 Pa. 192, 20 A.2d 217 (1941), construed similar language in a 15-year lease as effecting a sale of coal in place:

"The instrument in the instant case contemplated the exhaustion of the coal in the land. That is, it conveyed all the coal and gave the right to mine and take away without limit. It is hard to differentiate this from a sale. In our opinion the defendant held title to the coal in place for all purposes * * *." 20 A.2d at 221.

We find this reasoning sound and applicable to the instant case. FAP conveyed to TVA the right to mine, remove, and retain title to all uranium. It is difficult to differentiate this transaction from a "sale," notwithstanding the argument by appellees

4. $1.1666/lb. of $U_3O_8$ × 163,500 lbs. of $U_3O_8$ = $190,739.

that the federal government owned the minerals in question prior to their severance from the ground. No other sale of uranium in any form was ever made to TVA from appellant's property. TVA simply retained title to the end product—milled uranium—for use as fuel. We conclude, therefore, that the mining lease agreement effected a sale of the uranium ore to TVA.

Next, we must consider whether FAP sold TVA "mined [and] produced" ore, so as to trigger FAP's obligation to pay CMU 40% of the resulting profits. Under the interim agreement and the subsequently executed definitive agreement, FAP acted as contractor on behalf of TVA, developing and milling the ore at TVA's convenience and expense. The entire series of agreements between FAP and TVA contemplate the mining and production of the ore which, as we have seen, was sold to TVA. At the moment that the mining lease agreement and the interim agreement were signed, FAP was under a *contractual obligation* to mine and produce ore from the subject properties. The physical performance of these obligations is immaterial to our purpose of determining whether FAP owed CMU a portion of the advance royalties. The important point is that FAP promised to develop the ore for TVA, subject to sanctions for failure to do so. Therefore, in light of the terms of the writings, the relationship of the parties, the nature and situation of the subject matter and the purpose of making the agreements, *Dawson v. Meike*, supra, we hold that the mining lease agreement and the interim agreement constituted a sale of mined and produced ore such that FAP became obligated to pay CMU its share of the proceeds resulting from those transactions.

■ FAP also advances the argument, successful at trial, that its investment in the mining properties (for example, acquisition and exploration costs) prior to the 1973 mining lease agreement with TVA depleted the advance royalties so that, after discounting to present value, nothing remained to pay CMU. It is clear, however, that, regardless of legitimate investment

costs associated with other properties subject to the mining lease agreement, no payments were made to CMU for acquisition purposes. Furthermore, no documentation so much as suggests that the advance royalties attributable to the properties in question were consumed by costs listed on Schedule A of the contract of purchase and sale and incurred by FAP prior to 1973. In contrast, the evidence submitted by FAP shows that after 1973 approximately $17,000,000 were expended to develop the subject properties over and above the actual mining costs from 1978 to 1981.

Paragraph 4d of the contract of purchase and sale requires FAP to furnish complete accounting statements showing factors that affected the distribution of profits. In view of FAP's failure to offer any documentation whatsoever as to the allocation of the advance profits attributable to the properties in question, we must conclude that, absent a showing to the contrary on remand, CMU became entitled to 40% of those royalties upon their payment to FAP under the mining lease agreement.

## ANNUAL NET PROFITS

■ The parties disagree as to the proper method of determining gross proceeds attributable to the uranium ore after completion of the milling process. The contract of purchase and sale provides that gross proceeds shall be

"* * * based upon prices established in Circular 5 Revised, or, in event that such schedule should be supplemented by another, the schedule then in effect or the market price then current for such ore * * *."

The contract expressly excludes from gross proceeds any proceeds from milling the ore into $U_3O_8$ concentrate, or yellow cake, as it is commonly called. The parties' dispute results from the fact that none of the methods specified in the 1957 contract for computing gross proceeds works to extrapolate ore proceeds from the market value of yellow cake between 1978 and 1981.

Circular 5 listed prices that the Atomic Energy Commission would pay for various

grades of unprocessed uranium ore based on a value of $8 per pound of processed $U_3O_8$ concentrate. Neither Circular 5 nor a supplemental circular was in effect when the ore involved here was mined and milled, since the abolishment of the Atomic Energy Commission in 1974[5] rendered these schedules obsolete. In addition, no market for unprocessed ore existed in the Gas Hills district at the relevant times, making the contract's alternate basis for determining gross proceeds—"the market price then current for such ore"—inapplicable.

In an effort to resolve this dilemma, FAP submitted to the trial court three different methods for determining gross proceeds. The first method, and the one accepted by the trial court as consistent with the contract, purported to update Circular 5 to reflect the values of unprocessed ore based on values of $U_3O_8$ which ranged from $36 to $45.34 per pound at the times relevant here. Gross proceeds were thus calculated by multiplying Circular 5 values for raw ore by the factor by which the value of $U_3O_8$ had increased since the circular went into effect.[6]

This method assumes that the costs associated with mining increased proportionally to those costs associated with milling. We find this assumption erroneous since it ignores the effects of technological advances on both procedures, their respective labor intensities, and the degree of skill required in each operation. Therefore, we conclude that the gross-proceeds figures obtained from Circular 5, as modified, were not sufficiently reliable to permit the trial court to award CMU its proper share of profits.

The second theory advanced by FAP for determining gross proceeds involved the averaging of three ore purchase-price schedules compiled in 1976. Two of the schedules refer to ore mined in Utah, and one lists standard prices. We agree with the trial court as to the undesirability of this method of arriving at gross proceeds,

since none of the schedules concerns ore mined in the Gas Hills district and all pre-date the mining of the subject properties.

The third alternative proposed by FAP we find to be the most appropriate means of calculating CMU's fair share of profits due to mined uranium ore. This method computes gross proceeds by deducting commercial milling rates from the sales value of yellow cake. The base commercial milling rate was determined to be $23/ton of ore by appellees' expert witness who had researched the matter in 1978 for a mining company located in the Gas Hills district. For purposes of calculation, the base rate was escalated at 8% per year from 1978. This method awards FAP commercial profits for its milling operation, consistent with the contract of purchase and sale, based upon milling rates that are typical of other mills operating at that time.

■ We approve of this method as a reliable means of implementing the intent of the parties to compensate CMU out of proceeds derived from the sale of processed ore, exclusive of milling profits. Where the market for disposing of a royalty owner's minerals changes from that originally contemplated by the parties, the court's duty is to construe the royalty agreement fairly so as to effectuate the intent of the parties. *LeCuno Oil Company v. Smith*, Tex.Civ.App., 306 S.W.2d 190 (1957).

In view of our holding that CMU is entitled to participate in the advance royalties paid to FAP, on remand the amount of such royalties proportionate to each pound of recovered $U_3O_8$ must be deducted from annual net profits payable to CMU.

## EVIDENCE ESTABLISHING GROUNDS FOR RESCISSION OF THE CONTRACT OF PURCHASE AND SALE

■ The trial court refused to admit evidence offered by CMU to prove bad faith on the part of FAP in breaching the con-

---

**5.** Pub.L. 93–438, Title I, § 104(a), October 11, 1974, 88 Stat. 1237.

**6.** For example, the multiplication factor would be 5.335 where the current market value of $U_3O_8$ is $42.68 per pound and the Circular 5 value of $U_3O_8$ is $8 per pound.

tract of purchase and sale. Such evidence, appellant contends, would have established a basis upon which to rescind the contract.

FAP takes the position on appeal that the contract of purchase and sale is a deed transferring title, which instrument is not subject to forfeiture absent some express provision such as a right of re-entry or a power of termination. We cannot agree.

A number of courts have held that a conveyance of a mineral interest in consideration of royalties on production amounts to a lease and may be cancelled upon a proper showing. The Kentucky Court of Appeals construed such an agreement in *Kentucky Rock Asphalt Co. v. Milliner,* 234 Ky. 217, 27 S.W.2d 937 (1930). There, in consideration of $5 plus future royalties, appellee had granted " 'all of his right, title and interest, in and to all deposits of oil, bitumen and their products.' " 27 S.W.2d at 937. Thirty-nine years later the grantee had made no effort to develop the property. In holding that the instrument, regardless of its label, was intended as a lease and, therefore, was subject to forfeiture, the court quoted extensively from *Eastern Kentucky Mineral & Timber Co. v. Swann-Day Lumber Co.,* 148 Ky. 82, 146 S.W. 438, 46 L.R.A.(N.S.) 672 (1912):

> " ' * * * In an attempt to ascertain whether a deed like this was intended by the parties to be a conveyance in fee simple, or only a contract or lease under which the grantees must begin operations within a reasonable time, there is no feature entitled to more weight than the one relating to the consideration and the manner of its payment. There is and should be a marked difference between the construction and effect of a conveyance of timber and minerals, or indeed any interest in land, for a stipulated consideration, payable in cash or in secured notes or in some other valuable property, and the construction and effect of a conveyance in consideration of a royalty or per cent., to be paid out of the income derived by the grantees from the property conveyed. * * * When the consideration has been fully satisfied, and the grantor has parted with his estate, the transaction between the parties is a closed incident. The grantor has no further interest or concern in the property conveyed. But a very different situation is presented when the only consideration the grantor is to receive is a per cent. of the profits the grantee may realize from the development of the estate. Under such a contract the consideration is a continuing one, to be paid only by the labor of the grantee in the development of the property. The grantor has a continuing interest in the estate conveyed, the transaction between the parties is not a closed incident, and the grantee is not at liberty to do with the property as he pleases. He cannot use or fail to use it to the prejudice of the grantor who has rights that must be respected.' " 27 S.W.2d at 938–939.

See also *Davis v. Mann,* 234 F.2d 553, 558 (10th Cir.1956); *Crain v. Pure Oil Co.,* 25 F.2d 824, 830 (8th Cir.1928); *Tennessee Oil, Gas & Mineral Co. v. Brown,* 131 F. 696, 702–703 (6th Cir.1904).

Under the contract of purchase and sale in the instant case, the consideration is a continuing one. FAP's ongoing obligations to CMU include diligent development and sale of ore, the payment of minimum monthly sums once a commercial body of ore is ready for extraction, the timely distribution of 40% of annual net profits, and accountings. We conclude that such an agreement is properly denominated a "lease" and may be cancelled upon a showing of a material breach.

In *Vitro Minerals Corporation v. Shoni Uranium Corporation,* Wyo., 386 P.2d 938 (1963), we considered the grounds necessary to rescind a mining lease, which contained a clause expressly providing for forfeiture under certain circumstances. We said that evidence going to the bad faith of the lessee is admissible and relevant in establishing grounds for rescission, 386 P.2d at 940. We quoted with approval from Annot., 60 A.L.R. 901, 925:

> " 'But it has been held that forfeitures, even though expressly provided in a min-

ing lease, for the failure to develop and properly mine, are even less favored than are forfeitures generally, much being left to the discretion of the operator. In the absence of evidence of fraud or bad faith, such forfeitures will not be enforced; for a breach of a covenant properly to work the premises, especially if due to a mistake of judgment only, the wilful default or bad faith of the lessee not being shown, a forfeiture of the lease will not be decreed. * * * ' " 386 P.2d at 942.

We hold that evidence of bad faith and material breach is admissible to establish grounds for rescission, should CMU choose to pursue such a remedy on remand.

Reversed and remanded to the district court for proceedings consistent with this opinion.

THOMAS, Chief Justice, concurring and dissenting.

I find that I cannot agree in toto with the views of either the majority opinion or the dissenting opinion in this case. I am in accord that the case must be reversed for errors of law committed by the trial court. I agree with the view taken in the dissenting opinion, however, that the Contract of Purchase and Sale entered into by the appellants and the predecessor of the appellees is not simply a lease subject to recision for a breach of the covenants. In my view the remedy of the appellants is limited to damages.

On this latter point I will content myself with saying that the transaction between federal partners and the TVA encompasses many of the characteristics of the common-law profit a prendre recognized by this court in *Denver Joint Stock Land Bank of Denver v. Dixon*, 57 Wyo. 523, 122 P.2d 842, 140 A.L.R. 1270 (1942); and *Boatman v. Andre*, 44 Wyo. 352, 12 P.2d 370 (1932). This latter authority indicates that one may lose one's rights under a profit a prendre by abandonment. It would seem to follow that a failure of any covenants in connection with the profit a prendre would be addressed by the remedy of damages rath-

er than recision. While fraud in the inducement might void the transaction if the rights of bona fide purchasers for value have not intervened, that is not the claim that I understand is made here, and consequently I would not recognize a right of recision in the appellants.

This may not be an important matter because it seems to me that damages are going to be the remedy in any event. That is essentially what the appellants seek. The real question then is whether the appellants have been paid that which is due them under their agreement.

The majority opinion holds that the appellants have not been paid that which is due them, and I agree. I find in Schedule "A," which is attached to, referred to and made a part of the Contract of Purchase and Sale, the following language:

"Gross proceeds shall include any and all premium, incentive and other bonus payments received for or upon sale of the ores (to the extent permitted by law) and shall include development allowance. Any freight allowance in excess of freight costs incurred shall be included."

The dissenting opinion accuses the majority of rewriting the contract for the parties. In fact, it was the district court which rewrote the contract. The advance royalty of seven million dollars which TVA agreed to pay to the appellees and the advance royalty of sixty-two and one-half cents per pound for "inferred ore" were payable to the appellees without regard to any future production. They were not payments for costs in advance, and the application of the third royalty clause in the agreement between TVA and the appellees does not have the effect of making them payments in advance for costs. That clause protects the right of the appellees to share in future profits, and provides for payment in addition to the advance royalties, but TVA prudently provided that the advance royalties should be counted as costs in the computation of the appellees' right to share in future profits. The advance payments come within the definition of Gross Proceeds quoted from Schedule "A" and there-

fore must be included in the computation of net profits as provided in paragraph four of the Contract of Purchase and Sale between appellants and appellees. It follows that the appellants were entitled to have net profits computed in accordance with the formula described in the majority opinion. I am satisfied with the conclusion of the majority that the record does not justify the deduction from those advance royalties of any of the items included in Schedule "A" to the Contract of Purchase and Sale.

With respect to the computation of annual net profits, I also agree with the holding in the majority opinion. It is compatible with the ends of justice that when assumptions fail with respect to contract terms it is fair to look at the facts. The facts in this instance are that the price of the $U_3O_8$ is known. An acceptable figure for the milling expense can be determined. The ore developed from the property sold by the appellants is determinable, and net profits are therefore subject to computation. The appellees presumably can demonstrate the actual expense of any of the items found in Schedule "A" for which they were not reimbursed pursuant to their contract with TVA. It is then from this net profit figure that a pro rata portion of the advance royalties may be deducted by the appellees in accounting to the appellants.

As I indicated, I would reverse the trial court in part and affirm it in part, and I agree that the case should be remanded for further proceedings.

ROONEY, Justice, dissenting.

I dissent.

This dissent was submitted in response to an earlier majority opinion, and is equally applicable with reference to the final majority opinion, especially concerning (1) the propriety of rewriting by the majority opinion of the pertinent agreements of the parties in complete disregard of the plain and unambiguous language of such agreements, and (2) the determination by the majority opinion of facts on appeal con-

trary to that done by the trial court on the basis of substantial evidence and contrary to our well established rule for appellate review. A short addendum has been added to the original dissent to point out a few of the inconsistencies in the majority opinion.

The majority opinion fails to accept the findings of fact made by the trial court after a two and one-half day trial as is required by repeated holdings of this court. As early as 1923, Justice Blume noted that we must accept as true the testimony supporting findings on conflicting evidence. *Seaman v. Big Horn Canal Ass'n*, 29 Wyo. 391, 213 P. 938 (1923). Since then, we have often said that in examining the record, the supreme court must assume that the evidence in favor of the successful party is true, must not consider the evidence of the unsuccessful party in conflict therewith, and must give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it. *Metcalfe v. Winchester*, 72 Wyo. 142, 262 P.2d 404, 407 (1953); *Holbrook v. Continental Oil Company*, 73 Wyo. 321, 278 P.2d 798, 802 (1955); *Twing v. Schott*, 80 Wyo. 100, 338 P.2d 839, 840 (1959); *Western Standard Uranium Company v. Thurston*, Wyo., 355 P.2d 377, 385 (1960); *Stock v. Roebling*, Wyo., 459 P.2d 780, 784 (1969); *Piner v. Piner*, Wyo., 511 P.2d 94, 95 (1973); *Douglas Reservoirs Water Users Association v. Cross*, Wyo., 569 P.2d 1280, 1283 (1977); *Farella v. Rumney*, Wyo., 649 P.2d 185, 186 (1982), and many others.

Secondly, the majority opinion accurately sets forth law regarding interpretation of contracts, but misapplies it—in effect rewriting the contract for the parties contrary to the plain words of the contract. A summary of the applicable law in this respect is set forth in *Amoco Production Company v. Stauffer Chemical Company of Wyoming*, Wyo., 612 P.2d 463, 465–466 (1980):

"Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. [Citations.] If the contract is in

writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract. [Citations.] And the contract as a whole should be considered, with each part being read in light of all other parts. [Citations.] The interpretation and construction is done by the court as a matter of law. [Citations.]

"If the contract is ambiguous, resort may be had to extrinsic evidence. [Citations.] An ambiguous contract 'is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present.' [Citation.] Ambiguity justifying extraneous evidence is not generated by the subsequent disagreement of the parties concerning its meaning. [Citation.]

" * * * Whether ambiguity exists is a question of law. [Citations.] * * *

" * * * Even if there be an ambiguous term or portion of the contract, extrinsic evidence is not considered if the meaning of the ambiguous term or portion of the contract can be ascertained from other language of the contract, i.e., from the contract as a whole. [Citations.]" (Footnote omitted.)

In this appeal, we must consider two contracts: (1) a "Contract of Purchase and Sale" between appellant and appellees' assignors and some third-party claim locators who have no pertinency in this appeal; and (2) a contract consisting of two basic instruments (a "Mining Lease Agreement" and an "Interim Agreement" which was superseded by an "Exploration and Milling Agreement") between appellees and Tennessee Valley Authority, hereinafter referred to as "TVA."

The Contract of Purchase and Sale which was executed November 1, 1957, defined the subject thereof as follows:

"1. PROPERTY: The property concerned, consists of *unpatented lode mining claims* * * * as the same appear of record * * *." (Emphasis added.)

The provisions of the contract as they relate to the consideration to be paid by ap-

pellees' predecessor are separated as they pertain to appellant and as they pertain to the third-party claim locators. The portion pertaining to the third-party claim locators provides for payment to them of a 10% royalty computed on the *gross* receipts from the sale of ores mined, produced and sold from the claims. Other provisions as to them concern the time of payment, payment of taxes, maintenance of records, minimum royalty and statement of interest. The portion pertaining to appellant provides in part:

"4. OWNER'S [Appellant's] PARTICIPATION: * * * the Purchaser [appellees' assignor] covenants and agrees to pay to the Owner, its successors, assigns or legal representatives, a sum constituting forty per cent (40%) *of the annual net profits* from all uranium, vanadium and other associated minerals and ores *mined, produced and sold* from the property, computed in accordance with and under the terms and conditions hereinafter set forth. * * *

"a. COMPUTATION: Net profits shall be arrived at by *deducting from gross proceeds* those items listed upon the schedule of deductions hereto attached as Exhibit A.

"b. BASIS FOR GROSS PROCEEDS: Gross proceeds shall include the proceeds from *ore sold based upon prices established in Circular 5 Revised, or, in event that such schedule should be supplemented by another, the schedule then in effect or the market price then current for such ore; it shall not include the proceeds from the operation of any concentration or milling operation or benefication process which might be erected upon the property or erected, owned or operated by the Purchaser.*

*       *       *       *       *       *

"f. MINIMUM PAYMENT: During this agreement, Purchaser *will work* the property diligently and in minerlike fashion *with the object of discovering, producing and marketing commercial ores.* Within sixty (60) days *after Pur-*

*chaser develops a commercial deposit of ore ready for extraction,* it shall pay Owner a minimum of Five Hundred Dollars ($500.00) per month as net profits therefrom, which payments shall be a credit upon any and all of Owners share of net profits as herein defined. Such minimum payments shall cease when such ore body has been exhausted unless another ore body has been developed and made ready for extraction. * * * " (Emphasis added.)

Included in the numerous items [1] listed in Exhibit A referred to in subparagraph a, *supra,* to be deducted from gross receipts are:

"3. Reserves set aside by Purchaser for *future development work* * * * adjustment will be made at the end of each fiscal year to reduce said reserves *to actual development costs* for the year." (Emphasis added.)

The foregoing contract language is plain and unambiguous in setting forth the intention of the parties to the effect that the subject matter of the contract concerns only undeveloped mineral claims and that any *final payment must wait* until the claim is worked to result in ores "mined, produced and sold," with an interim payment of $500.00 per month to be paid when the ore body is ."developed and made ready for extraction." All payments are to amount ultimately to 40% of "annual net profits" from "ores mined, produced and sold," and gross profits on ore sold are to be "based upon prices established in Circular 5 Revised, or, in event that such schedule should be supplemented by another, the schedule then in effect or the market price then current."

Of course, these contract provisions only reflect the practical aspect of the situation. When the contract was executed, the nature and amount of ore was unknown. The claim could turn out to be barren, or the ore could be of such poor grade that the cost of mining *plus milling* would not be economical. Generally, it is necessary to mill the mined ore before its sale value can be determined. The milling process costs money. When the element (uranium, gold, etc.) is not sold until after milling, the cost of milling must be subtracted from the sale price to determine the value of the ore.

There was a conflict of evidence with reference to the use or supplementation of Circular 5 Revised and to the market price of ore. The trial court heard the testimony and reviewed the exhibits placed in evidence and found that the method and alternate method of accounting contained in Sections I and II of Exhibit A were the only ones that followed the contract.[2] It must be remembered that the contract was executed November 1, 1957. Only the Atomic Energy Commission could buy uranium at that time. Circular 5 Revised was created to govern purchases by the Commission. It computed the portion of the purchase price for uranium which was attributable to the original cost of ore after subsequent processing (milling) had been accomplished.

Witness Boulton's testimony was, in part, as follows:

"A. The basic formula outlined in the contract, as I see it, is a determination of the value of unprocessed ore, which has been mined, produced and sold, from that number a deduction is made for certain mining costs as outlined in Schedule A of that exhibit. One which net profit calculated and Owners in this case are would participate in 40 percent of that net profit number.

"Q. And on what basis would the proceeds or gross proceeds be calculated?

"A. In my opinion with respect to taking into account my experience, I would say the X/8 escalation formula as applied to Circular 5 table.

\*   \*   \*   \*   \*   \*

---

1. E.g., costs of equipment, machinery, salaries, supplies, development work, royalty, taxes, depreciation, etc.

2. The court applied Section I because it "provides the greater benefits to" appellant.

"Q. Okay. And do you use or have you used the Circular 5 with the X/8 revision for calculations on your other interests, on other uranium properties.

"A. Yes.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Let me ask you, Mr. Boulton, when we speak of Circular 5 X/8, what does that mean, what is the X/8 portion?

\*　　\*　　\*　　\*　　\*　　\*

"A. X/8 is the formula to escalate the formula in Circular 5 based upon the differences of the prior, yellowcake value from $8.00 as established under Circular 5 to whatever the current market price of concentrate is.

"Q. So, Circular 5, the price of uranium is $8.00?

"A. Circular 5 schedule to provide prices for unprocessed ore based upon a selling price of processed concentrate at $8.00 per pound.

"Q. And X/8 is the adjustment to current market price for concentrate?

"A. To escalate that price, based upon changes in yellowcake value from $8.00 to whatever the current price is for yellowcake value.

"Q. When you use the Circular 5 with X/8 formula, does it matter what year you use that calculation in?

"A. No. As an example, if the current price of uranium is $40. per pound for yellowcake concentrate, the Circular 5 schedules are based upon the 8 dollars, you divide the 8 into current price referred to as X, that establishes a factor of five times, multiply the Circular 5 schedule by the 5 times which would result being Circular 5 price escalated at the same basis of uranium concentrate price changes.

"Q. And that particular calculation is used to establish an unprocessed ore price when you have a concentrate sale?

"A. Yes, it is to place a value on or before it is processed."

**3.** The fact that the ore was not mined, produced or sold until 1978 was firmly established by the

Thus, the trial court applied the plain and unambiguous language of the contract relative to determination of the gross proceeds from the ore, i.e., "prices established in Circular 5 Revised, or, in event such schedule should be supplemented by another, the schedule then in effect or the market price then current." It considered the evidence and made a factual finding that the X/8 formula as applied to Circular 5 resulted in the market price or in the price as intended by the parties to the contract.

The majority opinion concludes that the trial court erred in finding that ore was not "mined, produced and sold" under the contract until 1978 [3] on the basis that a sale occurred in 1973 by virtue of the execution of the first of a series of instruments between appellees and TVA, the first of the series being of date April 27, 1973, and the eighth amendment being of date September 6, 1979. This series of instruments comprise the basic instrument labeled "Mining Lease Agreement." There are several faults in the reasoning of the majority opinion in this respect.

Appellant is to be paid under its purchase and sales agreement with appellees when the ore is "mined, produced and sold." The majority opinion considers the fact that no ore was "mined or produced" not to be a material deviation from the requirements of the agreement since it was "sold" to be mined and produced later. That is the same as saying that there is no material deviation on a trip from Cheyenne to Denver by the way of Salt Lake City, Utah. The agreement is plain and unambiguous in requiring payment only when the ore is "mined, produced and sold" not only when it is "sold." The parties were specific in using language that required all three operations as a condition of payment. Their intent was plainly expressed.

" \* \* \* [T]he cardinal rule in the construction of contracts being \* \* \* that the intention of the parties, as exhibited by the language they have used shall

evidence.

govern." *Fuchs v. Goe*, 62 Wyo. 134, 163 P.2d 783, 791, 166 A.L.R. 1329 (1945). "It is one thing to interpret a contract or to discern the contractual intent of the parties pursuant to established legal rules, but it is another thing to make a contract for the parties. We are obliged to do the former, and we are prohibited from doing the latter." *McCartney v. Malm*, Wyo., 627 P.2d 1014, 1020 (1981). " * * * [T]he supreme court will not rewrite clear contracts. [Citation.] Nor will this court rewrite contracts under the guise of interpretation. * * * " *Wyoming Machinery Company v. United States Fidelity and Guaranty Company*, Wyo., 614 P.2d 716, 720 (1980).

Additionally, payment to appellant prior to the ore being mined and produced is not practical or possible. The Mining Lease Agreement between appellees and TVA concerned a great many mining claims in the Gas Hills area. (Appellant's two claims are among about 75.) The evidence reflected the ore in appellant's claims to be borderline for economic production. The Mining Lease Agreement provided for payment for "pounds of $U_3O_8$ concentrate" (milled uranium). Obviously, the payment includes the cost of the ore, its development and the milling. To determine the proportion of any amount due appellant from the advance payment for "pounds of $U_3O_8$" would require an advance determination of the ore to be produced from appellant's few claims in proportion to that from the other claims in addition to advance determination of the milling and other costs. The Circular 5, X/8 formula could be used to separate the milling from the ore costs but only if there were an accurate figure to which to apply the formula. Such figure could not exist prior to determination of the actual price received for milled ore from appellant's claims. Even if a gross profit figure could be established, the costs attributable to taking the ore from these few claims, i.e., salaries, equipment, etc. as list-

ed in Exhibit A referred to in subparagraph a, supra, (a special problem involving a geologic fault in these claims did surface, causing extra expense), would have to be known in advance. This would be an impractical situation, and one obviously not intended by the parties.

The association of the "Mining Lease Agreement" and the "Interim Agreement" with the superseding "Exploration and Milling Agreement" will be discussed infra.

Turning then to the two issues as presented by appellant on appeal of this case:

ISSUE I: DID THE CONCLUSIONS OF LAW CONTAINED IN THE DISTRICT COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW NOS. 2, 3, AND 4 REFLECT PROPER LEGAL STANDARDS AND PRINCIPLES?[4]

The two findings of fact and conclusions of law referred to and argued by appellant read:

"2. On April 27, 1973, defendants entered in an agreement with TVA to develop the property in question and other properties. Defendants were to be paid for their costs and profits. TVA agreed to pay $7 million to defendants before production as an advance on costs. Plaintiff is entitled to participate in this payment to the extent reflected in Exhibits A and B of defendants.

"4. From October, 1978, through 1981, Defendants mined and produced uranium from the claims held by plaintiff. The ore was not sold at that stage but was milled by Defendants and then transferred to TVA under that contract, whereupon Defendants were paid for both mining and milling in one sum. Nevertheless, the contract held by Plaintiff and Defendants can be applied to this situation and may even have been anticipated by the contract, which provides in the first instance for computation of gross proceeds by application of a predeter-

---

**4.** In its brief, appellant withdrew its objections to paragraph 3 of the Findings of Fact and Conclusions of Law.

mined Circular 5 formula, not by the application of the actual price for which the ore might be sold. Therefore, the amounts due Plaintiff can be computed in accordance with the contract by applying the Circular 5 prices, as supplemented, to the tonnage mined, deducting the costs allowed in the contract, and paying 40% of this to Plaintiff, giving Defendants credit for the monthly payments. This was done in Exhibit A of Defendants, Section I. This method and the alternative one in Section II of Exhibit A are the only accountings presented which follow the contract. The method in Section I is the one first mentioned in the contract and provides the greatest benefits to Plaintiff. Therefore it is the one which should be adopted. Accordingly, judgment will be entered in favor of Plaintiff and against Defendants in the amount of $3,306, together with court costs and interest at the legal rate from January 1, 1979, as this is a liquidated sum which could be determined by mathematical calculations from the contract formula and which was due on January 1, 1979."

With reference to paragraph 2, appellant contends that (1) the agreement there referred to, i.e., the Mining Lease Agreement, was not to "develop the property in question and other properties" but was a sale of minerals in place; (2) the paragraph improperly infers that the development was to be a joint one between TVA and appellees; (3) the costs were all those of TVA and appellees had none, wherefore the statement that appellees "were to be paid for their costs" was error; and (4) TVA's agreement to pay $7 million to appellees before production was not an "advance on costs."

As already noted, appellees' ownership of the "property" as defined in its acquisition agreement was ownership of "unpatented lode mining claims," i.e., undeveloped mineral claims. The minerals in place were owned by the United States. Consistent therewith, the Mining Lease Agreement between appellees and TVA was one to "develop" the "unpatented lode mining claims." The trial court so found. Other provisions of the Mining Lease Agreement between TVA and appellees reflect the intention of the parties for it to be an agreement to "develop" the claims. The grant is "the exclusive right to explore, develop, mine, extract and remove" minerals from the claim, and *"thereafter* to retain all right[,] title and interest in and to all such *severed* minerals"—not a grant to ownership of minerals in place. The instrument also contains requirements for annual assessment work, provisions for forfeiture upon breach, and it is called a lease—all inconsistent with a sale of minerals in place. The trial court would have erred if it found the agreement to be a sale of minerals in place in view of the plain and unambiguous language of the agreement.

I cannot find any language in paragraph 2 of the Findings of Fact and Conclusions of Law from which it can be inferred that the property was to be developed *jointly* by TVA and appellees, contended by appellant to have been an erroneous finding of the trial court. The trial court's language is plain in stating that appellees "entered in an agreement with TVA to develop the property." Certainly, the language of the grant in the 1973 Mining Lease Agreement between TVA and appellees is positive and plain in setting forth the fact that the development was to be "the exclusive" right of TVA.

Considering together appellant's third and fourth contentions relative to paragraph 2 of the court's findings and conclusions [5], the intention of the parties as expressed in the contract of which the Mining Lease Agreement is a part, is properly reflected in the court's findings and conclusions.

The April 27, 1973 contract between appellees and TVA was contained in two doc-

5. The costs were all those of TVA and appellees had none, wherefore, the statement that appellees "were to be paid for their costs" was error, and TVA's agreement to pay $7 million to appellees before production was not an "advance on costs."

uments, both executed the same day. One document was titled "Mining Lease Agreement." It consisted of 23 pages and had 23 pages of attached schedules. As already noted, it was amended 8 times over a period of about 4 years (81 pages in amendments). The other document was titled "Interim Agreement." It consisted of 7 pages and recited that:

"WHEREAS, the parties hereto have this date entered into a Mining Lease Agreement (hereinafter 'Lease'), a copy of which is attached hereto as Exhibit A and made a part hereof * * *."

It also had an additional 10 pages of exhibits and schedules. It provided that it was entered into:

" * * * until such time as * * * [the parties] are able to develop a definitive Exploration and Milling Agreement."

On April 11, 1974, the "definitive" agreement was executed. It provided that the Interim Agreement "is hereby superseded by this Exploration and Milling Agreement." It consists of 75 pages and 125 pages of exhibits. It was amended 7 times between April 1, 1976 and May 18, 1980 (68 pages). It made reference to the Mining Lease Agreement as one of the bases for its execution. It generally provided as did the Interim Agreement but in much greater detail.

The "Mining Lease Agreement" and the "Interim Agreement" are to be considered as a single agreement between the parties.

"A written agreement may consist of more than one document. *Allen v. Allen*, Wyo., 550 P.2d 1137 (1976). * * *

* * * * * *

" * * * [R]eference in a contract to extraneous writings renders them part of the agreement for indicated purposes. *Kilbourne-Park Corporation v. Buckingham*, Wyo., 404 P.2d 244 (1965); * * *." *Busch Development, Inc. v. City of Cheyenne*, Wyo., 645 P.2d 65, 68, 70 (1982).

" * * * Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties. * * * * " 17 Am.Jur.2d Contracts § 263, pp. 666–667.

"The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract or instrument. * * * * " 17 Am.Jur.2d Contracts § 264, p. 668.

The Exploration and Milling Agreement is a contemplated refinement of the Interim Agreement executed on April 27, 1973.

The Interim Agreement provided that appellees' "costs incurred in performing its obligations to TVA under this agreement shall be reimbursed to the extent allowable under this paragraph." The paragraph sets forth the requirement that the costs be "reasonable" and in accordance with "generally accepted accounting principles;" that they "include but not be limited to taxes on the mill and reasonable general and administrative costs;" that officers' and directors' salaries be excluded; that depreciation "on the existing mill" be excluded, but that "[t]o the extent capital expenditures are required in order to repair, maintain, or expand the mill," as approved by TVA, be included. Similar acceptance of various costs by TVA were agreed upon, such as "management of the mining properties," and "exploration work" with respect to mining properties. It provided priority for milling ores directed to the mill by TVA and for payment by TVA of shutdown, standby and start-up costs plus $50,000 per year if the mill was idle; it provided a payment of up to $250,000 a year for each year 290,000 tons of ore were not processed by the mill. It provided for the setting up of an operating account to which TVA would deposit money for withdrawal by appellees for allowable costs.

The definitive "Exploration and Milling Agreement" expanded on the terms of the Interim Agreement. It required detailed

annual budgeting and planning, and it specified the allowable costs in detail.

The "Mining Lease Agreement" required a payment by TVA to appellees of:

"fifty percent (50%) of the amount by which the market price for $U_3O_8$ concentrate exceeds the production cost of such concentrates, *which costs shall include payments made pursuant to paragraphs A and B above * * *.*" (Emphasis added.)

The costs referred to in paragraphs A and B as payments or advancements made toward production costs were:

"A. As concerns 6,000,000 pounds of $U_3O_8$ contained in reserves upon the Mining Properties and presently classified as Indicated Ore, Lessee shall pay Lessor Seven Million dollars ($7,000,000) payable:

"(1) Four Million Five Hundred Thousand dollars ($4,500,000) at closing; and

"2. Two Million Five Hundred Thousand dollars ($2,500,000) on or before January 1, 1979.

"B. As concerns 2,400,000 pounds of $U_3O_8$ contained in reserves presently classified as Inferred Ore (over and above the said 6,000,000 pounds referred to in A above), an amount equal to sixty-two and one half cents (62½¢) per pound of $U_3O_8$ in that category determined by March 31, 1975, to be Indicated Ore, up to and until a maximum of One Million Five Hundred Thousand dollars ($1,500,-000) is owed to Lessor. * * * "

"Indicated ore" was defined as:

" * * * [O]re that has been sampled at such reasonably close intervals that assumptions can be made on the continuity, grade and amount of ore bounded by the sample points."

"Inferred ore" was defined as:

" * * * [O]re for which quantitative estimates are based largely on broad knowledge of the geologic character of the deposit and for which there are few, if any, samples or measurements. The estimates are based on an assumed continuity or repetition for which there is

geologic evidence; this evidence may include comparison with deposits of similar type. Bodies that are completely concealed may be included if there is specific geologic evidence of their presence. Estimates of inferred ore should include a statement of the special limits within which the inferred ore may lie."

These instruments adequately reflect the contract intention of the parties for appellees to set up and operate a uranium processing plant near Riverton for the processing of ore from the many claims which they had under lease in the Gas Hills area (including the two of appellant), and to sell the milled product to TVA. The costs to be incurred by appellees in exploration, milling, administrative operations, property management, etc., were to be advanced by TVA. Appellees were to profit to the extent of 50% of the amount by which the market price of the concentrate exceeded the production costs.

There was an unqualified recognition by the parties to the instruments forming this contract that the amount to be paid to the lessors (including appellant) of the numerous properties leased by appellant would be determined *after* the milling process. The large amount of money to be received by appellees under the "Mining Lease Agreement" could not have been contemplated to consist of payment for ore and thus be subject to be allocated among the numerous lessees inasmuch as it was specifically included in "payments made" for "production" costs, and inasmuch as the interest of each lessee could not be determined until after the milling process resulted in a certain number of pounds of concentrate attributable to each claim, and until the many costs of extraction, etc., for each claim could be deducted from the gross amount. As noted, the contract between the parties was also plain and unambiguous in this respect, requiring payment of 40% of the *net* profit from ore "mined, produced and sold."

Also as noted, even if the money received by appellees in 1973 was taken to be for

apportionment among the many lessees, the result would be the same. The after-milling price would have to be determined, the pounds of ore from each claim would have to be determined, the costs of development would have to be determined, and the net profit would end up with the same amount due appellant as was reflected by the evidence.

The trial court heard over three days of testimony relative to the operations of the parties and the accountings resulting from the contract. Exhibits were numerous. After considering the same, it properly found that appellees were to be paid for their costs by TVA and that the $7 million agreed by TVA to be paid to appellees before production was an advance on costs.

Finally with reference to Issue No. 1, appellant contends error in the court's Finding of Fact and Conclusion of Law No. 4 in that it finds the sale of the ore to have occurred after it was mined and produced, and in that the sale price was properly determined by use of the Circular 5, X/8 formula. That already said answers this contention. Even if it were agreed that title to the ore passed before it was mined and produced, its value could not be ascertained until after it was milled. Appellant would have this court accept the testimony of its expert witness as to damages while acknowledging that damages could not be accurately testified to by him on the basis of the information at hand. The trial court opted to believe the other witnesses. As noted, this court must accept the evidence in support of the findings by the trial court and disregard conflicting evidence.

The trial court's Findings of Fact and Conclusions of Law were supported by substantial evidence and were in accordance with the intent of the parties to the two contracts pertinent to this case.

ISSUE 2: DID THE DISTRICT COURT ERR IN REJECTING APPELLANT'S CONTENTIONS THAT IT WAS ENTITLED TO A CANCELLATION OF THE CONTRACT OF PURCHASE AND SALE AND AN ACCOUNTING FOR ONE HUNDRED PERCENT (100%) OF THE VALUE OF THE URANIUM REMOVED FROM THE CLAIMS, LESS REASONABLE COSTS OF MINING AND MILLING SAID URANIUM, BECAUSE OF APPELLEES' BREACH OF DEPENDENT COVENANTS CONTAINED IN THE CONTRACT OF PURCHASE AND SALE OF NOVEMBER 1, 1957, OR BECAUSE OF APPELLEES' BAD FAITH IN FAILING TO ACCOUNT AND PAY NET PROFITS AS CONTEMPLATED BY SAID CONTRACT OF PURCHASE AND SALE; AND, AS A RESULT THEREOF, DID THE COURT ERR IN REFUSING TO ADMIT AND CONSIDER APPELLANT'S EXHIBITS 27 THROUGH 64 IN SUPPORT OF SUCH CONTENTIONS?

That which I have already said relative to the misconceptions of the majority opinion and relative to appellant's argument on the first issue presented reflects the lack of error on the part of the district court in connection with this issue.

The plain language of the contract reflects that payment to appellant was not to be made until the ore was "mined, produced and sold," and that the minimum payment of $500 per month "as net profits therefrom, which payments shall be a credit upon any and all of owner's share of net profits" shall be made within 60 days "after purchaser develops a commercial deposit of ore ready for extraction." Implicit in the judgment of the district court is the finding that the $9,000 paid by appellees was the amount due under the minimum payments clause, which clause required the payments to begin 60 days after the ore was ready for extraction. Also implicit in the judgment is the finding that the claims were developed in a minerlike fashion as required. There was evidence to support these findings, and the court awarded interest of $963.72 for the delay in payment of some of the minimum payments. Also implicit in the judgment is the finding that any deviation from the terms of the Contract of Purchase and Sale of the claims

was not a substantial one. There was evidence to support these findings which are implied in the judgment.

Appellant received that called for by the Contract of Purchase and Sale. It received 40% of the net profits from the sale of the ore from the two claims. It contended that it was entitled to a share of the profit from the milling process, but such was obviously not required by the Contract of Purchase and Sale.

The court found the accounting presented by appellees to be proper, and it rejected the testimony of appellant's accountant witness. Appellees' accounting reflected the gross proceeds received from the two claims as determined by application of the Circular 5, X/8 formula. The propriety of this method was discussed supra. A monthly itemization of tons, grade, pounds contained, market price, etc., was set forth. The accounting lists the pit mining costs by items (waste removal, mining, reclamation, production taxes, etc.) for each year since the operation began in 1978. The net profit was the difference between the gross proceeds and the costs. The court awarded 40% of the net profit so determined to appellant, less the $9,000 minimum payment already made, and plus the accrued interest of $963.72.

Appellant argues that the Contract of Purchase and Sale, dated November 1, 1957, was a lease and not a deed and that the obligation of appellees to pay appellant is a dependent covenant wherefore the lease must fail if payment is not made, and appellant is entitled to 100% and not 40% of the net profits. Not only was proper payment made, but the instrument has the requisites of a deed since in it appellant and the third-party claim locators to it "convey, quitclaim and assign" the claims to appellees' predecessor (see *Whalon v. North Platte Canal & Colonization Co.,* 11 Wyo. 313, 71 P. 995 (1903)). Since it was a deed without a right of reentry or reversion, it would not fail. But, even if it were a lease, performance was made under it, and any failure to make some of the minimum payments on time, or furnish accountings, are not dependent covenants, the violation of which are material deviations from the terms of the contract. The case cited by appellant for definition of a dependent covenant supports this finding; a finding implicit in the trial court's judgment.

"A covenant is dependent where it goes to the whole consideration of the contract; where it is such an essential part of the bargain that the failure of it must be considered as destroying the entire contract; or where it is such an indispensable part of what both parties intended that the contract would not have been made with the covenant omitted. * * * " *Steak House, Inc. v. Barnett,* Fla., 65 So.2d 736, 738 (1953).

Accountings by appellees were required under the Contract of Purchase and Sale, but only when distribution of payments was made. Appellees contended that such distributions were never in order because the claims did not produce one sufficient for a net profit. In fact, appellees contended that a loss occurred from developing these two claims. The trial court found otherwise and found a small resulting profit. Fraud and bad faith cannot be said to have existed on appellees part simply because the trial court found their sincere position to be wrong. It is further noted that appellant was authorized by the Contract of Purchase and Sale to examine the records of appellees "during business hours and not oftener than once each month" and if appellant reasonably believed the payments to be incorrect, it had "the right to cause an audit to be made of the records * * * by an independent certified public accountant." It did not do so.

The foregoing refutes appellant's final contention that the trial court erred in refusing to admit appellant's Exhibits 27 through 64 into evidence, they being in support of appellant's position relative to there being a breach of dependent covenants in the Contract of Purchase and Sale and the existence of bad faith on the part of appellees.

When offered, the objection was for the reason that the only purpose served would be to support appellant's count for punitive damages which the court had already ruled against. Appellees had argued to the district court that punitive damages are not usually awarded in breach of contract actions, *Waters v. Trenckmann*, Wyo., 503 P.2d 1187, 1188 (1972). The propriety of the trial court's ruling in this respect is not before us. Appellant argued to the district court that the exhibits were offered for all the issues in the case. An offer of proof was dispensed with because the exhibits were included in the record.

The exhibits consisted of material from appellees' files. They were interoffice memorandums, letters between appellees and TVA and between appellees and their legal counsel. They concerned the economic feasibility of developing the two claims and the time table for doing so. They referred to the necessity for beginning the minimum payments at the proper time, and similar matters.

It would seem that their admission into evidence would have little bearing on the matter one way or the other. In any event, the failure of appellant's theory relative to the requirements of the two pertinent contracts makes the admission or nonadmission of the exhibits to be immaterial. They would be pertinent only if the wording of the contracts were to be changed by the court to require payment to appellant when the transaction between appellees and TVA was entered into rather than when the ore was "mined, produced and sold."

## ADDENDUM

The majority opinion alleges that:

" * * * all rights to the ore were sold *prior* to its being mined and produced. * * * " (Emphasis in original.)

and again:

"The language in the mining lease agreement, as well as surrounding circumstances, leads us to conclude that the agreement constituted a *sale* of ore to TVA, notwithstanding the document's designation as a lease. Under the lease agreement FAP granted to TVA

" " * * * the exclusive right to explore, develop, mine, extract and remove from the Mining Properties all uranium and other fissionable source materials, * * * and *thereafter* to retain all right title and interest in and to all such severed minerals.' * * * " (Emphasis in original omitted, and emphasis added.)

It may be that the "rights to the ore" were sold prior to its being mined and produced, as recited in the first quotation, but the majority opinion completely disregards the word "thereafter" in the second quotation—language which is plain and unambiguous in reflecting the time of transfer of "all right title and interest" in the ore to be *after* it is extracted and produced.

Additionally, the second quotation indicates that the agreement was for a sale "notwithstanding the document's designation as a lease." Then, subsequently, the majority opinion reads:

" * * * We conclude that such an agreement is properly denominated a 'lease' and may be cancelled upon a showing of a material breach."

The inconsistency is obvious.

Since I find no error by the trial court, I would affirm.